United States Court of Appeals,

Fifth Circuit.

No. 85-1015.

Norman JETT, Plaintiff-Appellee,

v.

DALLAS INDEPENDENT SCHOOL DISTRICT, Defendant-Appellant.

Nov. 29, 1993

Appeal from the United States District Court for the Northern District of Texas.

On Remand From the Supreme Court of the United States.

Before KING and GARWOOD, Circuit Judges.[*]

GARWOOD, Circuit Judge:

This case is before us on remand from the United States Supreme Court. *Jett v. Dallas Independent School District,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989).

The facts and procedural posture of the case are reflected in the Supreme Court's opinion and in our earlier opinions herein. *Jett v. Dallas Independent School District,* 798 F.2d 748, *rehearing denied,* 837 F.2d 1244 (5th Cir.1988). For present purposes, it suffices to note that plaintiff-appellee Norman Jett (Jett), formerly a teacher, coach, and athletic director at South Oak Cliff High School (South Oak Cliff) in the Dallas Independent School District (DISD), brought this suit under 42 U.S.C. §§ 1981 and 1983 against the DISD and the South Oak Cliff principal, Dr. Frederick Todd (Principal Todd), complaining that his transfer from South Oak Cliff to a teaching position without any coaching duties at another

---

[*]This decision is rendered by a quorum pursuant to 28 U.S.C. § 46(d).

DISD school violated his constitutional rights to equal protection of the laws and freedom of speech. The transfer was made on the recommendation of Principal Todd and was ordered and approved by the DISD superintendent, Dr. Linus Wright (Superintendent Wright), who was not made a defendant. Principal Todd did not purport to order the transfer and he had no authority to do so. No action respecting the transfer was taken by the DISD board of trustees, nor was that matter ever brought, or sought to be brought, before the board of trustees. Jett, who is white, claimed that Principal Todd, who is black, was improperly motivated in making his transfer recommendation by racial considerations and by Jett's exercise of his First Amendment rights, and that he, Jett, had told Superintendent Wright, before Wright approved the transfer recommendation, that Principal Todd's real reason for recommending the transfer was that he wanted to replace Jett with a black coach.[1]

The case was tried to a jury, which awarded Jett damages against the DISD and Principal Todd individually, finding that Principal Todd's transfer recommendation was substantially motivated by both Jett's race and his exercise of First Amendment rights and that the DISD's transfer of Jett "was based solely on Defendant Todd's recommendation without any independent investigation." Following *remittitur* of some of the damages,

---

[1]As noted in our prior opinion, Todd testified race played no part in his recommendation, and Wright testified that neither Jett's race nor his having made statements to the media played any part in his decision and that he was unaware that Todd had based his recommendation on remarks Jett made to the media. *Jett,* 798 F.2d at 761.

judgment on the verdict was entered for Jett and against the DISD and Principal Todd.

On the appeal to this Court by the DISD and Principal Todd, we affirmed the district court insofar as it held Principal Todd liable for making his transfer recommendation on the basis of Jett's race and First Amendment protected speech.[2] We reversed and remanded Jett's section 1983 equal protection and First Amendment claims against the DISD because the district court's jury instructions failed to state that the DISD "could be bound by the principal or superintendent only if he was delegated policy making authority (or if he participated in a well settled custom that fairly represented official policy and actual or constructive knowledge of the custom was attributable to the governing body or an official delegated policy making authority)." *Jett,* 798 F.2d at 759.[3]   We further held that the same standards applied to

[2]Jett also alleged in the district court, and the jury found, that he had a property interest in his position at South Oak Cliff which the DISD deprived him of without due process of law, and that the DISD constructively discharged him from its employment.  We reversed and rendered judgment against Jett on these claims, holding that as a matter of law Jett was not constructively discharged and that his transfer from South Oak Cliff did not deprive him of a property interest as his full agreed compensation was continued.  These matters are no longer at issue.  Nor is Principal Todd's personal liability any longer at issue, as he and Jett settled while the case was pending rehearing in this Court. *See Jett,* 491 U.S. at 707-709, 109 S.Ct. at 2708.

[3]We further held that the charge was deficient even if it were assumed that Superintendent Wright, having the final authority in deciding whether a given transfer of a particular teacher-coach would be made, also had the requisite policymaking authority in respect to such transfers, because nothing in the charge required the jury to find "that Wright's decision was in fact improperly motivated or that Wright knew or believed that (or was consciously indifferent to whether) Todd's recommendation was so motivated." *Id.* at 760.  We noted in this connection that "Todd clearly was *not* a policymaker." *Id.* at 761.

governmental liability under section 1981, and accordingly reversed and remanded Jett's section 1981 claim against the DISD. *Id.* at 761-763.

The Supreme Court granted Jett's petition for *certiorari* on the section 1981 issue and also granted the DISD's cross-petition. 488 U.S. 940, 109 S.Ct. 363, 102 L.Ed.2d 353 (1988). As to the former, the Court held that:

> "... the express "action at law' provided by § 1983 for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor. Thus to prevail on his claim for damages against the school district, petitioner must show that the violation of his "right to make contracts' protected by § 1981 was caused by a custom or policy within the meaning of *Monell* [*v. New York City Dept. of Social Services,* [436 U.S. 658] 98 S.Ct. 2018 [56 L.Ed.2d 611] (1978) ] and subsequent cases." *Jett,* 491 U.S. at 735, 109 S.Ct. at 2722.[4]

The Court accordingly affirmed our judgment "to the extent that it holds that the school district may not be held liable for its employees' violation of the rights enumerated in § 1981 under a theory of *respondeat superior.*" *Id.* 491 U.S. at 738, 109 S.Ct. at 2724.

With respect to the DISD's sections 1981 and 1983 liability under the standards of *Monell* and subsequent cases, the Supreme Court determined, as we had, that the jury charge in this respect "was manifest error" because it assumed that either Principal Todd or Superintendent Wright was a DISD policymaker or that *respondeat*

---

[4]The Court had earlier "assume[d] ... without deciding, that petitioner's rights under § 1981 have been violated by his removal and reassignment" since the DISD had never argued "that § 1981 does not reach petitioner's employment injuries." *Id.* 491 U.S. at 711, 109 S.Ct. at 2710.

*superior* was applicable. *Id.* 491 U.S. at 737, 109 S.Ct. at 2723. The Court then reviewed the standards for "determining where policymaking authority lies for purposes of section 1983" as enunciated in the plurality opinion in *St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). *Jett* 491 U.S. at 737, 109 S.Ct. at 2723. It stated that " "whether a particular official has "final policymaking authority" is a question of *state* law,' " *id.* (quoting *Praprotnik,* 485 U.S. at 122-24, 108 S.Ct. at 924, quoting *Pembaur v. Cincinnati,* 475 U.S. 469 at 483-84, 106 S.Ct. 1292 at 1300 (1986) (plurality opinion)), that "the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge," and that:

> "Reviewing the relevant legal materials, including state and local positive law, as well as " "custom or usage" having the force of law,' *Praprotnik, supra* [485 U.S.] at 124, n. 1, 108 S.Ct. at 924, n. 1, the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett,* 491 U.S. at 737, 109 S.Ct. at 2723.

The Court noted that the DISD "urges us to review Texas law and determine that neither Principal Todd nor Superintendent Wright possessed the authority to make final policy decisions concerning the transfer of school district personnel" and that "Jett seems to concede that Principal Todd did not have policymaking authority as to employee transfers ... but argues that Superintendent Wright had been delegated [such] authority...." *Id.* 491 U.S. at 738, 109 S.Ct. at 2723. The Court then concluded by stating:

> "We decline to resolve this issue on the record before us. We think the Court of Appeals, whose expertise in interpreting

Texas law is greater than our own, is in a better position to determine whether Superintendent Wright possessed final policymaking authority in the area of employee transfers, and *if so* whether a new trial is required to determine the responsibility of the school district for the actions of Principal Todd in light of this determination.... We remand the case to the Court of Appeals for *it* to determine where final policymaking authority as to employee transfers lay in light of the principles enunciated by the plurality opinion in *Praprotnik* and outlined above." *Id.* 491 U.S. at 738, 109 S.Ct. at 2724 (emphasis added).

Preliminarily, we observe that the Court's remand order focuses on whether Superintendent Wright, not Principal Todd, had the requisite relevant policymaking authority. There is no evidence that Principal Todd had such authority, and Jett does not claim otherwise. We further note that the Court adverted to the possibility of a new trial only if it were determined that Superintendent Wright *had* such policymaking authority.[5] In this connection, there is no evidence or claim of any practice or custom of transferring DISD personnel on the basis of race, the exercise of First Amendment rights, or similar constitutionally proscribed basis. The only evidence of official DISD policy in this respect was that it proscribed any such action.[6] Thus, the only possible

---

[5]A new trial might be required in that instance—indeed would be under our prior opinion—because the jury charge did not condition DISD's liability on a finding (and the evidence did not establish as a matter of law) that "Wright knew or believed that (or, perhaps, was consciously indifferent to whether) Todd's recommendation was ... based" on Jett's race or exercise of First Amendment rights. *Jett,* 798 F.2d at 761. See note 3, *supra.*

[6]The only evidence of DISD policy on discrimination was a written policy adopted by the DISD board of trustees that included the following:

"On the basis of an individual's race, color, religion, sex, national origin, or age, the District shall not fail or refuse to hire or discharge, nor shall it otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of

basis for DISD liability is if Superintendent Wright "possessed final policy making authority as to employee transfers," a question that the Court has directed be decided "in light of the principles enunciated by the plurality opinion in *Praprotnik* and outlined above." *Jett,* 491 U.S. at 738, 109 S.Ct. at 2724.

The *Praprotnik* plurality and the Supreme Court's opinion in *Jett* make clear that this is a question of state law. Texas law is clear that final policymaking authority in an independent school district, such as the DISD, rests with the district's board of trustees. Texas Education Code § 23.01 provides that "The public schools of an independent school district shall be under the control and management of a board of seven trustees."[7] The Education Code further provides that "[t]he trustees shall have the *exclusive* power to manage and govern the public free schools of the district," *id.* § 23.26(b) (emphasis added), and that "[t]he trustees may adopt such rules, regulations, and by-laws as they may

employment; nor shall the District limit, segregate, or classify its employees, or applicants for employment, in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise affect the individual's status as employee."

The only evidence respecting DISD policy concerning basing employee transfers on their First Amendment protected speech was the following testimony of Superintendent Wright on examination by Jett's counsel:

"Q. Surely, Mr. Wright, it is not consistent with your own policy and the policy of the DISD to use as a reason for demotion or transfer the public speech or remarks made by one of your employees, is it?

A. Not at all."

[7]Section 23.023 provides that districts "with 64,000 or more students in average daily attendance shall be under the management and control of a board of nine trustees."

deem proper."  *Id.* § 23.26(d).  Nothing in the Texas Education Code purports to give the Superintendent any policymaking authority or the power to make rules or regulations, whether as to teacher or teacher/coach transfers or otherwise.[8]  It is to be noted that the Education Code gives the board of trustees not only what might be described as a form of legislative power over the district they serve—the power to make "rules, regulations and by-laws"—but also a form of executive power, the power to "control" and the "exclusive" power to "manage" as well as to "govern" the district.

This has been recognized in Texas appellate court decisions. Thus, in *Pena v. Rio Grande City Consolidated Independent School District,* 616 S.W.2d 658 (Tex.Civ.App.—Eastland, 1981, n.w.h.) the court held that the superintendent of an independent school district was not an "officer" of the district for purposes of Tex.Rev.Civ.Stat.Ann. art. 5996a (Vernon Supp.1980-81), which prohibited "any officer of any ... school district" from voting for, confirming, or appointing to "any ... employment or duty ... any person" within a certain degree of relationship to the officer. To determine "officer" status, the court applied the test of whether the individual's exercise of governmental power was " "*largely independent of the control of others.*' "  *Id.* at 660.  It held that the superintendent did not meet that test.  It also stated in this connection that "[a] superintendent is *merely* an employee or agent of the school board," *id.* at 659 (emphasis

---

[8]After the events here in issue, the Texas legislature enacted section 13.351 of the Education Code (Acts 1984, 68th Leg., 2nd C.S., ch. 28, art. III, part F, § 1), which provides that "[t]he superintendent is the educational leader and the administrative manager of the school district."

added), and "[a] school superintendent *merely* performs functions delegated to him by the trustees who do not by such delegation abdicate their statutory authority or control." *Id.* at 660 (emphasis added). The *Pena* opinion was cited with approval in *Hinojosa v. State,* 648 S.W.2d 380 (Tex.App., Austin, 1983, discretionary review refused), where another Texas appellate court stated "the Education Code ... gives the trustees the *exclusive* power to *manage* and *govern* the school district. The superintendent and his subordinates were but employees or agents of the trustees." *Id.* at 386 (emphasis in original). We are aware of no decision which holds that under Texas law a school superintendent has policymaking authority. Indeed, Jett does not argue to the contrary.

Jett does contend that the DISD trustees had delegated final policymaking authority as to employee transfers to Superintendent Wright. He points to the fact that a DISD policy adopted by the board of trustees made the superintendent the final decisionmaker on an employee's challenge to his or her proposed transfer,[9] and to

_____

[9]This six-page policy governed both voluntary and involuntary transfers. Provisions respecting involuntary transfers included those arising from reduced enrollment or budget (providing, *inter alia,* for selection "based on the amount of seniority within certified fields, subject to departmental/extracurricular duties" and for restoration to position if justified by subsequent enrollment or budget increase before instruction had begun) and those for other reasons. As to the latter, the policy provides:

> "Any time during a school year that an immediate supervisor wishes to request the transfer of an employee for the ensuing school year, he or she shall complete the prescribed form, conduct a conference with the employee, secure the signature of the employee and forward the form to the office of the Subdistrict assistant superintendent. The Subdistrict assistant superintendent shall receive the request and issue an approval or

Superintendent Wright's testimony that he was the final

_____

denial.  If the request is approved, it shall then be forwarded to the personnel services department for processing, pending vacancies."

The policy provides for appeal as follows:

"For the purpose of this policy, the appeal procedure is available only for those receiving involuntary transfers and shall not be deemed a formal grievance.  District intent is to provide an expedited hearing for employees involuntarily transferred who feel that District policies were violated, action was arbitrary or capricious, or that constitutionally protected rights were violated.  Formal appeals shall be heard at the General Superintendent level, and the General Superintendent shall exercise final jurisdiction.  Employees requesting hearings shall do so in accordance with the following guidelines:

1. Within ten days after receipt of involuntary transfer notice, employees shall call or write the employee relations office to schedule an appointment to discuss the transfer and related concerns for the appeal.

2. The employee relations office shall make every effort to resolve the problem informally.

3. If efforts to resolve the problem informally are not successful, an appeal committee shall be established.  The committee shall be composed of:

a. One classroom teacher.

b. One principal.

c. One ombudsperson appointed by the General Superintendent.

4. The committee shall conduct a hearing that affords all parties the right to present information according to procedures prescribed by the committee.

5. The committee shall issue an advisory decision to the General Superintendent.

6. The General Superintendent shall review the advisory decision of the committee and issue a decision that shall be final and binding."

decisionmaker in instances where a teacher/coach objected to his proposed transfer.

However, that Superintendent Wright may have been delegated the final decision in the cases of protested individual employee transfers does not mean that he had or had been delegated the status of policymaker, much less final policymaker, respecting employee transfers. In *Pembaur* and *Praprotnik* the Court carefully distinguished between those having mere *decisionmaking* authority and those having *policymaking* authority. *Pembaur* first noted that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances," *id.* 475 U.S. at 480, 106 S.Ct. at 1298, and that "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id.* 475 U.S. at 481, 106 S.Ct. at 1299. *Pembaur* went on, however, to emphasize that, for the municipality to be liable, the decision (whether or not one of policy) must be made by an official with final *policymaking* authority in respect to the matter decided, *viz:*

> "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. [footnote omitted] The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. [citation and footnote omitted] The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.[12]"

_____

[12] Thus, for example, the County Sheriff mmay have discretion to hire and fire employees without also being the county official responsible for establishing county employment

policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff *is* the official policymaker, *would* give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions *would* represent county policy and could give rise to municipal liability." *Id.* 475 U.S. at 484 & n. 12, 106 S.Ct. at 1299-1300 & n. 12.

The example of the County Sheriff and Board of County Commissioners clearly reflects that the Court sharply distinguished between decisionmakers and final policymakers. This example was elevated from footnote to text in *Praprotnik,* where the Court held that it was error to base liability on the employment decisions of officials lacking final policymaking authority in that area, *viz:*

> "This case therefore resembles the hypothetical example in *Pembaur:* "[I]f [city] employment policy was set by the [Mayor and Aldermen and by the Civil Service Commission], only [those] bod[ies'] decisions would provide a basis for [city] liability. This would be true even if the [Mayor and Aldermen and the Commission] left the [appointing authorities] discretion to hire and fire employees and [they] exercised that discretion in an unconstitutional manner....' 475 U.S., at 483, n. 12, 106 S.Ct., at 1300, n. 12." *Praprotnik,* 485 U.S. at 130, 108 S.Ct. at 927.

*Praprotnik* similarly states that "the authority to make municipal policy is necessarily the authority to make *final* policy.... When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality," *id.* 485 U.S. at 127, 108 S.Ct. at 926 (emphasis in original), and that "[s]imply going along with discretionary

decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy." *Id.* 485 U.S. at 130, 108 S.Ct. at 927.  The Court then observed:

> "It would be a different matter if a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker.  It would also be a different matter if a series of decisions by a subordinate official manifested a "custom or usage' of which the supervisor must have been aware.  See *supra,* 485 U.S. at 127, 108 S.Ct. at 926.  In both those cases, the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official." *Id.* 485 U.S. at 130, 108 S.Ct. at 926-27.

Finally, *Praprotnik* expressly rejected the concept of "*de facto* final policymaking authority." *Id.* 485 U.S. at 129, 108 S.Ct. at 927.[10]

While *Praprotnik* and *Pembaur* do not expressly use the word "final" in their examples of officials who have decisionmaking but not policymaking authority, that much seems clearly implied in the description of the situation as one where the policymaking authority "left the [decisionmaking official] discretion to hire and fire employees," there being no suggestion of any qualification such as "initial" discretion or the decisionmaker's action being subject to appeal or the like.  The same conclusion follows from *Praprotnik* 's statement as to discretionary decisions of an official being constrained by policies not of his own making, as

---

[10]"Nor do we believe that we have left a "gaping hole' in § 1983 that needs to be filled with the vague concept of "*de facto* final policymaking authority.' *Post* [485 U.S., at 144, 108 S.Ct.], at 935.  Except perhaps as a step towards overruling *Monell* and adopting the doctrine of *respondeat superior,* ad hoc searches for officials possessing such "*de facto*' authority would serve primarily to foster needless unpredictability in the application of § 1983." *Id.*

that applies even to individual decisions which are not reviewable.

The Seventh Circuit expressly took this view of the matter in *Auriemma v. Rice,* 957 F.2d 397 (7th Cir.1992), where it held that the Chicago Superintendent of Police, Fred Rice, was not a city policymaker respecting police officer demotions that were allegedly racially motivated, notwithstanding that he had final authority to make the complained of demotions.[11]  We took essentially the same

_____

[11]The *Auriemma* Court observed:

> "On the plaintiffs' own theory, the buck stops with Fred Rice.  (The complaint alleges that Rice cleared his decisions with Harold Washington, then the mayor, but this is immaterial;  the mayor is an executive, not legislative, official in Chicago's system of government.)  Unless an entirely executive decision establishes municipal policy because it is final, the plaintiffs must lose.
>
> To state the issue in this way is to imply the answer.  For what can it mean to say "no vicarious liability' unless there is a distinction between creation and implementation of rules?  Any city acts exclusively through agents;  the city is just a name for a complex of persons.  If it were enough to point to the agent whose act was the final one in a particular case, we would have vicarious liability.  Action in the course of one's duty is the basis of vicarious liability.  That a particular agent is the apex of a bureaucracy makes the decision "final' but does not forge a link between "finality' and "policy'....  One may doubt the footing of *Monell* ... but that decision is not to be sabotaged by calling the chief bureaucrat who signs off on a particular action the city's "policymaker' for that action."  *Id.* at 399-400.
>
> " "[R]esponsibility for making law or setting policy'—the objective under *Praprotnik* of our search through local law—is authority to adopt rules for the conduct of government.  Authority to make a final decision need not imply authority to establish rules.  In Chicago it does not.  The Superintendent of Police in Chicago had no power to countermand the statutes regulating the operation of the department.  The chief has "complete authority to administer the department in a manner consistent with the ordinances of the city, the laws of the state, and the rules and regulations of the police board.'  ... If, in the course of selecting senior staff,

approach in the en banc opinions in *Bennett v. City of Slidell,* 728 F.2d 762, 735 F.2d 861 (5th Cir.1984), where "we rejected the line of authority ... which would permit policy or custom to be attributed to the city itself by attribution to any and all officers endowed with final or supervisory power or authority." *Id.* 735 F.2d at 862.[12]

Although several policies of the DISD board of trustees were put in evidence,[13] none purported to grant Superintendent Wright policymaking authority respecting employee transfers. Nor is there any other evidence that the DISD granted Superintendent Wright such policymaking authority.

Jett relies on the testimony of Superintendent Wright that he considered whether the DISD policy on employee transfers set out in note 9 above applied to those, such as Jett, who were coaches as well as teachers, as opposed to applying only to those who were

_____

> Rice discriminated on account of race and politics, he violated rather than implemented the policy of Chicago." *Id.* at 401.

[12]We specifically identified this rejected line of authority as that "discussed in part 3 [of our initial en banc opinion, 728 F.2d 762] and represented in particular by our opinion in *Schneider v. City of Atlanta,* 628 F.2d 915 (5th Cir.1980)." *Bennett,* 735 F.2d at 862. Part 3 of our initial en banc opinion in *Bennett,* 728 F.2d 762 at 766, described *Schneider* as follows:

> "We stated in *Schneider v. City of Atlanta,* 628 F.2d 915 (5th Cir.1980), that in those areas where a city officer "is the final authority or ultimate repository of [city] power his official conduct and decisions must necessarily be considered those of one "whose edicts or acts may fairly be said to represent official policy" for which the [city] may be held responsible under § 1983.' *Id.* at 920."

[13]These included those identified in notes 6 and 9, *supra,* and the DISD's one hundred-plus-page "Professional Personnel Guide."

merely teachers, to be "a gray area" in which he "had developed some practices" he "attempted to follow."[14]  This does not suffice

[14]Superintendent Wright's testimony in this respect includes the following:

"Q. And you were then of the opinion and still are that that was the only procedure, that is the informal meeting and conference that had transpired that existed within the D.I.S.D. to deal with the Jett situation?

A. No, it was not the only procedure but it just happened that the end results would have ended up the same because it would still have to come to me for the final decision. *Coach Jett* could have *had the opportunity*—whether he was aware of it or not I am not sure—*of appealing the decision of Dr. Todd* and [sic] which time *I would have appointed a panel to hear that.  They would have still made the recommendation to me.*  Since Coach Jett came to me directly as Mr. Santillo directed him then that procedure was bypassed.

Q.  Are you in agreement with Dr. Todd's testimony yesterday however that under the written transfer policy of the District that Coach Jett actually would have been entitled to a hearing [sic] this matter?

A. *If he had asked for it* before he came to me and if he had wanted it then *we could have gone through a formal hearing process* but I considered that he considered he was having his hearing when he was there with me.

Q. Okay.  I see.  Well, in fact—let me just find that policy real quickly.  Looking at Plaintiff's Exhibit 9 under your Provisions for Involuntary Transfer it states that the first thing that has to be done is that the immediate supervisor shall complete the prescribed form, conduct a conference with the employee, secure the signature of the employee and forward the form to the office of the sub District Superintendent, doesn't it?

A. In that case they are talking about teachers.

Q. Excuse me.  Is that what it says?

A. That is what it says, yes.

Q. And it doesn't say teacher.  It says any employee, right?

A. Right.

Q. And if the transfer provisions were pertinent just as Dr. Todd said yesterday he didn't follow that, did he?

A. Not per se, no.

Q. Well, he didn't do any of that, did he?

A. He made a recommendation to his immediate supervisor that Dr. Todd be involuntarily transferred to another position.

Q. I think you misspoke. You said Dr. Todd. You mean Dr. Todd made a recommendation to his supervisor that he be transferred?

A. Yes, sir.

Q. Yes, sir. But it doesn't say to his supervisor, does it? It says it shall be sent to the office of the sub District Assistant Superintendent, doesn't it?

A. In the case of a teacher that would apply. In the case of a Coach or an Athletic Director it would go to the Athletic Department.

Q. First of all, I thought you told us a few minutes ago that the policy of the District where they say teachers are customarily applied to Coaches and Athletic Directors?

A. Except that we have a *gray area* that is not covered here, Mr. Hill, in that Area Superintendents don't make the decision on Athletic Directors and Coaches per se. That is left up between the Athletic Department and the principal and myself.

Q. Is there any written statement of that?

A. No, sir, there is not.

Q. Well, in addition to that Coach Jett was being transferred involuntarily and a teacher too, wasn't he?

A. Correct.

Q. So *these policies would be pertinent to Coach Jett, wouldn't they?*

A. *That is what I meant a moment ago that he could have made such a request* if he was aware of it. I doubt he was aware of it.

to establish that the DISD board of trustees had delegated to

Q. Now, with respect to Coaches and Athletic Directors I believe you have indicated several times here there is no specific policy that covers that?

A. Not per se, no.

Q. But you have *developed some practices* that you attempt to follow within the District when those problems arise?

A. That is correct.

Q. And typically how is that situation handled?

A. Well, *we try to follow the same procedures* of trying to make sure that employees' considerations, employees are considered and the person making the recommendation considered and in the case of Athletic Director and Coach then it generally goes to the Administrator of Athletics which is Mr. John Kincaid and the principal to help work out those differences and then if it can't be resolved there then it is supposed to go to their immediate supervisor and then on up the ladder to me which I am the end of the appeal just like I am with teachers or anyone else.

Q. (By Mr. Townend) Superintendent Wright, when a problem arises between a principal and a Head Coach such as with Dr. Todd and Mr. Jett, can you describe the normal approaches or the normal ways in which that problem is dealt with within the District?

[Court overrides objection by Jett's counsel.]

A. Well, it is not only normal policy and practice but it is not stipulated personnel policy but it is stipulated in other administrative policies that any problem that arises as far as an employee, it goes through channels. In the case of athletics it goes from the principal to the Administrator for Athletics and to the Assistant Superintendent for district wide programs who has the responsibility for Athletics and from that person to the Superintendent.

If it is a teacher problem it goes from the principal to the Area Administrator to the Area Assistant Superintendent to the Superintendent so there is a channel for any problem that occurs that would be handled and that is not only normal but it is prescribed by policy under administration, not only personnel."
(Emphasis added).

Superintendent Wright final *policymaking* authority concerning employee transfers. Wright's testimony contains no such assertion. He was merely interpreting or applying the written policy of the DISD trustees, and, apparently, he was doing so erroneously, as the parts of the policy addressed (see note 9, *supra* ) speak of "employee" or "employees," not teachers or coaches or teacher/coaches.[15] Moreover, Wright's testimony in this regard is plainly directed only to the particular administrative channel to be initially followed by the supervisor requesting a transfer be made, namely whether the request is to go to "the Subdistrict assistant superintendent" as the policy says (see quotation at end of first paragraph of note 9, *supra* ) or whether, as Wright construed it, that did not apply to coaches (or teacher/coaches) and that instead in such a case the supervisor's request would initially go to the DISD's Athletic Department.[16] Even if Wright had the authority to provide for such a bureaucratic channel for teacher/coach transfer requests to initially follow, this would not suffice to show that he had relevant substantive policymaking authority respecting teacher/coach transfers, which is the only issue here.

Jett contends that Wright had a policy of approving involuntary transfers sought by a principal even though the

---

[15]In other parts of the policy it does refer to "teachers" and to "coaches," and, indeed, to "nurses," thus also indicating that the broader word "employee" or "employees" was used advisedly.

[16]Wright did not testify that the three-person hearing committee procedures (see quoted material in last paragraph of note 9, *supra* ) were different for coaches or teacher/coaches than for teachers.

principal was motivated by the employee's race or exercise of First Amendment rights, so long as there was an irreconcilable personality conflict between the principal and the employee. Assuming, *arguendo,* that there was sufficient evidence for the jury to infer that such a consideration motivated Wright's action in respect to Jett, it was certainly not the basis Wright articulated for his decision,[17] and there is no evidence that it was his policy. Jett relies on Wright's testimony that "[w]e had something here

[17]Principal Todd made various specific complaints about Jett, including Jett's poor attendance at faculty meetings, equipment purchasing policies, and lesson plan preparation. Wright testified that he discussed these matters with Jett, who told Wright "he [Jett] thought ... that whenever he [Todd] forced him [Jett] to come to teachers' meetings or faculty meetings and keep records of inventory and things like that that he [Jett] thought that was unreasonable," and that Wright then told Jett "I don't consider that unreasonable."  Wright further testified:

> "... I told Coach Jett that I felt that Dr. Todd was only carrying out his responsibilities as principal and that those were the kinds of things I expected him to do and that if, you know, if he was being unreasonable that was one thing but as far as the actual accountability of expecting an accounting for money and requiring him not make unauthorized purchases and requiring him to attend faculty meetings or requiring he have lesson plans, all of those were in the area of expectation of the teacher or Coach or any other employee in that building."

> Wright further testified:

> "Q. (By Mr. Townend) In your first conference did Mr. Jett suggest to you that Dr. Todd be transferred?

> A. Yes, sir, he did.  He felt that Mr. McWhorter had been unsuccessful and had been transferred and that he had such a successful record that he felt that Dr. Todd was the one in error.  That is when I came to the conclusion that there were differences that were not resolvable and I told Coach Jett at the time that if I have to make a decision between the principal and the coach it is obvious that the principal is responsible for the school and would be the one to stay *unless he was in error himself* and I *hadn't found anywhere where Dr. Todd was in error.*"  (Emphasis added).

that is unfortunate that happens a lot of time between two people and when it occurs someone has to give and I have to make that judgment decision as to who has to go and in this case it was coach Jett." This is not inconsistent with Wright's testimony (see note 17) that he approved the Jett transfer because the differences were irreconcilable "and I haven't found anywhere where Dr. Todd was in error," and certainly does not support an inference that Wright generally approved transfer recommendations despite their being unconstitutionally motivated. More significantly, such would be contrary to the policies of the DISD board of trustees and there is nothing to suggest that they knew or can be assumed to have known that Wright acted on such a basis. As previously observed, there is no evidence of any other unconstitutionally motivated employee transfer (or other personnel action) being taken or approved by Wright. This is a single incident case.

The evidence is simply not sufficient to support a finding that Superintendent Wright possessed final policymaking authority in the area of employee transfers. Under Texas law such policymaking authority rested exclusively with the DISD board of trustees, and there is no evidence they had delegated it to Superintendent Wright. Jett in substance argues for the kind of "de facto final policymaking authority" rejected in *Praprotnik.* 485 U.S. at 129, 108 S.Ct. at 927. Moreover, there is no evidence that Superintendent Wright's decision in Jett's case either "was cast in the form of a policy statement and expressly approved by the" DISD board or that "a series of decisions by" Wright in this area "manifested a "custom or usage' of which the" DISD board "must

have been aware." *Praprotnik,* 485 U.S. at 130, 108 S.Ct. at 926-27.

Accordingly, the judgment against the DISD and in favor of Jett is reversed and the cause is remanded with directions to enter judgment in favor of the DISD as respects all of Jett's claims against it.

REVERSED and REMANDED with DIRECTIONS

. . . . .

. . . . .

. . . . .

. . . . .