# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 30, 2010

No. 09-20624

Lyle W. Cayce
Clerk

JOSE VALLE, Individually and as Representative of the Estate of Omar Esparza; ASUNCION VALLE

Plaintiffs - Appellants

v.

CITY OF HOUSTON,

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY and GARZA, Circuit Judges and STARRETT[*], District Judge.

EMILIO M. GARZA, Circuit Judge:

Omar Esparza was shot and killed by Houston police officers during an incident at his family's home. His parents, Plaintiffs-Appellants Jose and Asuncion Valle (the "Valles"), individually and as representatives of their son's estate, sued the City of Houston ("City") seeking relief under 42 U.S.C. § 1983. The district court granted summary judgment in the City's favor on all claims. For the reasons set forth below, we AFFIRM.

## I

On the day of the incident, Esparza—who apparently had been suffering from depression and anxiety in the preceding months—became upset and locked

---

[*] District Judge of the Southern District of Mississippi, sitting by designation.

himself inside the family home and refused to allow his parents to enter. After about an hour, the Valles called 911 for assistance and requested a Spanish-speaking operator because neither of them spoke English. The Valles apparently hoped that the 911 call would bring medical assistance for their son.

The 911 dispatcher sent police officers to the Valles' home. The Valles allegedly showed the first officer on the scene, Officer Duarte, papers from their previous attempts to get Esparza admitted to a hospital for psychiatric treatment and requested that he help them get medical care for their son. Duarte then approached the front door of the house and conversed with Esparza (both Duarte and Esparza spoke English). Officers Walsh, Seay, and Chaisson then arrived and spoke with Esparza, who stated he would not come out of the house and would not let anyone in. The officers contacted their supervisor, Sergeant Bryant, who assumed control of the situation upon his arrival. After unsuccessfully attempting to communicate with Esparza, Sergeant Bryant contacted police headquarters to report the situation and seek orders. Captain Williams of the Special Weapons and Tactical/Hostage Negotiation Team ("SWAT") directed Sergeant Bryant to get a Crisis Intervention Team ("CIT") special officer to negotiate with Esparza. CIT Officer Broussard was called to the scene. She negotiated with Esparza for about thirty to forty minutes, but was unable to get him to come out of the house or allow officers into the house. The other non-CIT officers, without consulting Officer Broussard, sought and received permission from Captain Williams to forcefully enter the house. Esparza was not a suspect in any criminal activity, nor had he threatened the officers or himself. Nonetheless, Captain Williams authorized the entry and seizure, although he was neither present at the scene nor had any direct communication with CIT Officer Broussard.

Sergeant Bryant and three other officers armed themselves with a Taser, a shotgun loaded with soft-impact bean bags, and their sidearms. While CIT

Officer Broussard was still conversing with Esparza through the front door, Sergeant Bryant and Officers Chaisson, Duarte, and Walsh forcibly entered a side door of the house. The City alleged that Esparza was in possession of a hammer and charged at the officers when they entered. Less than thirty seconds after entry, the officers began discharging their weapons. Sergeant Bryant fired three blasts of non-lethal soft-impact beanbags from the shotgun he was carrying but was, apparently, unable to stop Esparza. Walsh fired his Taser and missed Esparza. Chaisson then fired his 40-caliber automatic pistol six times at Esparza—three bullets struck him. After the assault subsided, Mrs. Valle entered the home and saw her son lying on the floor; she saw no hammer.[1] Esparza died from his wounds.

SWAT Captain Williams was disciplined by the police department for his role in approving entry into the Valles' home. He successfully appealed his reprimand on the basis that he had acted within the policies and procedures of the police department.

The Valles sued the City[2] pursuant to 42 U.S.C. § 1983, alleging violations of the Fourth and Fourteenth Amendments flowing from the officers' warrantless forcible entry into their home and lethal seizure of Esparza. The Valles alleged that the officers exercised excessive force in entering their home and seizing Esparza pursuant to a City policymaker's orders, and that the City was liable under § 1983 for failure to properly train the officers who entered their home. The district court granted the City's first motion for summary judgment, finding that the decision to enter the Valles' home was not made by a City policymaker, and thus no City policy was a moving force in causing the

---

[1] In its summary judgment opinion, the district court improperly resolved the factual dispute about whether Esparza possessed a hammer in the City's favor. It should have credited Mrs. Valle's testimony that her son did not have a hammer.

[2] The Valles did not sue any of the officers involved in the shooting of their son.

Valles' injuries.  The district court also granted the City's second motion for summary judgment finding that, although the Valles raised a material fact issue as to the City's failure to train the officers, the Valles failed to show that a city policymaker acted with deliberate indifference and that the allegedly inadequate training was a moving force in bringing about the constitutional violation.

## II

We dispose first of the City's claim that the Valles lack standing.  The City argues that Esparza may have had a son, which would require administration of Esparza's estate under Texas law, thereby raising a question whether Appellant Jose Valle is the proper party to administer the estate.

We find the City's arguments without merit.  Texas law provides that when a person dies intestate, as Esparza did, the decedent's estate immediately vests in his heirs at law, subject to the payment of any debts of the estate.  TEX. PROB. CODE ANN. § 37.  Title to any estate passes equally to the decedent's parents in the absence of a spouse or children.  *Id.* at § 38(a)(2), (b)(2). Administration of the estate is necessary if "two or more debts exist against the estate."  *Id.* at § 178(b).  As required, the Valles submitted evidence demonstrating that an estate administration was neither pending nor necessary. *See Shepherd v. Ledford*, 962 S.W.2d 28, 31–32 (Tex. 1998) (holding that heirs at law may maintain a wrongful death or survival suit without administration of the estate if they allege and prove that there is no administration pending and none necessary).  Even if Esparza did have a son, a point that the parties contest, the Valles still have standing under Texas law to recover wrongful death damages on behalf of themselves and all others entitled to recover under the wrongful death statute.  TEX. CIV. PRAC. & REM. CODE ANN. § 71.004(b).  The City's conclusory allegation that Esparza's estate requires administration is insufficient.  Accordingly, the district court's determination that the Valles have standing to sue was correct.

No. 09-20624

### III

This court reviews a grant of summary judgment de novo. *Mack v. City of Abilene*, 461 F.3d 547, 555 (5th Cir. 2006) (citing *Morris v. Dillard Dep't Stores*, 277 F.3d 743, 747 (5th Cir. 2001)). Summary judgment is appropriate only if no genuine issue of material fact exists. FED. R. CIV. P. 56. All facts and inferences are construed in the light most favorable to the non-moving party. *Murray v. Earle*, 405 F.3d 278, 284 (5th Cir. 2005).

### IV

### A

The Valles argue that the City is liable for entering their home in violation of the Fourth Amendment and for using excessive force to seize their son, which resulted in his death. The Valles assert that Captain Williams was acting as the City's final policymaker with respect to arrests and seizures when he authorized entry into the Valles' home, and thus his actions constitute City policy for the seizure at issue here.

It is well established that a city is not liable under § 1983 on the theory of respondeat superior. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A municipality is liable only for acts directly attributable to it "through some official action or imprimatur." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). To establish municipal liability under § 1983, a plaintiff must show the deprivation of a federally protected right caused by action taken "pursuant to an official municipal policy." *See Monell*, 436 U.S. at 691. A plaintiff must identify: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (citing *Piotrowski*, 237 F.3d at 578).

5

The existence of a policy can be shown through evidence of an actual policy, regulation, or decision that is officially adopted and promulgated by lawmakers or others with policymaking authority. *Burge v. St. Tammany Parish*, 336 F.3d 363, 369 (5th Cir. 2003). "[A] single decision by a policy maker may, under certain circumstances, constitute a policy for which a [municipality] may be liable." *Brown v. Bryan County*, 219 F.3d 450, 462 (5th Cir. 2000). However, this "single incident exception" is extremely narrow and gives rise to municipal liability only if the municipal actor is a final policymaker. *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008) (citing *Woodard v. Andrus*, 419 F.3d 348, 352 (5th Cir. 2005)).

Under the second prong, "[a]ctual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority." *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984) (en banc); *see also Piotrowski*, 237 F.3d at 579. This circuit has long distinguished between final decisionmaking authority and final policymaking authority. *See Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1247 (5th Cir. 1993) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 484 n.12 (1986) and *Praprotnik*, 485 U.S. at 130). A municipal policymaker is someone who has "the responsibility for making law or setting policy in any given area of a local government's business." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988). "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481. Whether an official possesses final policymaking authority for purposes of municipal liability is a question of state and local law. *Id.* at 482.

The third prong requires a plaintiff to prove "moving force" causation. To succeed, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link

between the municipal action and the deprivation of federal rights." *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). That is, "the plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.* at 411. Deliberate indifference is a high standard—"a showing of simple or even heightened negligence will not suffice." *Piotrowski*, 237 F.3d at 579 (quoting *Brown*, 520 U.S. at 407).

The Valles do not argue that the City has a formal written policy or custom that caused the unconstitutional seizure of their son.[3] Instead, they contend that the City is liable for Captain Williams's single unconstitutional decision to order entry into their home to seize their son. To succeed on this claim, the Valles must show that Captain Williams had final policymaking authority and that his decision was the moving force behind the constitutional injury. The Valles appear to argue that some lesser "decisionmaking" authority to make the one-time decision at issue is sufficient. *See Pembaur*, 475 U.S. at 481 ("If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood."). This argument is based on a misunderstanding of *Pembaur* and this circuit's precedent. *See Bolton*, 541 F.3d at 548–50 (discussing the distinction between final decisionmaking authority and final policymaking authority and noting that a municipality may only be liable for a decision of a final policymaker). We have long recognized that the "discretion to exercise a particular function does not

---

[3] The only formal policy referred to by the parties is the police department's General Order ("GO") 600-05, which defines the appropriate course of action for SWAT officers to follow in special threat situations (*i.e.*, a barricaded suspect). The district court determined that this policy was neither unlawful nor the moving force behind the alleged constitutional violations. Indeed, Captain Williams was reprimanded for ordering the forceful entry of the Valles' home because that decision was found to be a violation of GO 600-05.

necessarily entail final policymaking authority over that function." *Bolton*, 541 F.3d at 549 (citing *Praprotnik*, 485 U.S. at 130; *Pembaur*, 475 U.S. at 483–84); *Jett*, 7 F.3d at 1247.

Under Chapter 34 of the City Code of Ordinances, the Chief of Police may delegate authority to another and such person "so designated shall be vested with the full authority of the office of chief of police." HOUSTON, TEX. CODE OF ORDINANCES §§ 34-24. The Valles contend that the Chief of Police exercised his policymaking authority in promulgating GO 600-05, which delegates the Chief's full policymaking authority to the Assistant Chief of Police for Tactical Operations and to the Captain of Tactical Operations—here, Captain Williams. They further argue that Special Operating Procedure ("SOP") 200/1.01 specifically designated the Captain of Tactical Operations as the person responsible for determining how to implement GO 600-05. In particular, SOP 200/1.01 states that the Captain of Tactical Operations shall be contacted regarding a special threat situation and "will determine whether a full, partial or no SWAT response is appropriate." The Valles contend that when a decision is made under GO 600-05 and SOP 200/1.01 about how to handle a special threat situation, the person who makes that decision is "making policy for the specific arrest" because the designated decisionmaker is exercising authority delegated by the chief of police who is the final policymaker for arrest decisions.

Although GO 600-05 and SOP 200/1.01 confer decisionmaking or operational command authority on Captain Williams, it does not follow that Captain Williams, or another person to whom such authority is delegated, acts in a policymaking capacity. Captain Williams was afforded a certain measure of discretion in carrying out the City's policy. But "[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." *Praprotnik*, 485 U.S. at 127. The Valles do not contend

No. 09-20624

that either GO 600-05 or SOP 200/1.01 were policies made by Captain Williams pursuant to delegated policymaking authority. Rather, they are policies made by other officials that Williams was required to follow. Assuming that Captain Williams was delegated some level of decisionmaking authority, GO 600-05 and SOP 200/1.01 constrained his authority and set forth the range of choices which he could make in a given situation. The fact that Captain Williams made the final decision in this situation does not mean that he was setting City policy regarding the making of arrests.[4] Nor does the fact that Captain Williams's decision violated Esparza's right to be free of an unconstitutional seizure elevate his decision to one attributable to the municipality.[5]

Although Captain Williams's decision to order entry into the home was arguably the "moving force" behind the constitutional violations that resulted in Esparza's death, because his decision was not a decision by a final policymaker of the City, the City cannot be liable. Thus, the district court properly granted summary judgment on the Valles' municipal liability claim against the City.

**B**

The Valles also argue that the City is liable because it failed to adequately train its patrol supervisors in the use of CIT tactics. As a result, the Valles

---

[4] The Valles argue that because the "City's rules, orders, and policies point to [Captain] Williams to make the decision and gave him this authority to do so—a straight delegation from the chief," it follows that Captain Williams's decision to tell the officers to forcefully enter the Valles' home was "the City's policy for that arrest." If this argument were correct, then a municipality could be liable for almost any decision of its employees that resulted in a constitutional violation because the unconstitutional decision could be said to be the policy for that particular decision. Such a theory of liability has been soundly rejected. *See, e.g.*, *Praprotnik*, 485 U.S. at 126 ("If the mere exercise of discretion by an employee could give rise to [liability for] a constitutional violation, the result would be indistinguishable from respondeat superior liability.").

[5] The Valles contend for the first time in their reply brief that even if Captain Williams's decision to order entry of their home was not an exercise of policymaking authority, the City is nonetheless liable for that decision because it ratified Williams's unconstitutional actions. The Valles have waived this argument by failing to raise it in their opening brief. *See, e.g.*, *Tharling v. City of Port Lavaca*, 329 F.3d 422, 430 (5th Cir. 2003).

contend that the CIT officer on the scene at their home was overruled by a non-CIT-trained supervisor, which resulted in immediate and lethal escalation of the situation, an outcome that CIT training was intended to prevent.

The standard applicable to a failure-to-train claim is the same as the standard for municipal liability. *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005). "The failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Bryan County*, 219 F.3d at 457 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). "In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *City of Canton*, 489 U.S. at 390. A plaintiff must show that (1) the municipality's training policy or procedure was inadequate; (2) the inadequate training policy was a "moving force" in causing violation of the plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policy. *See, e.g.*, *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010); *Pineda*, 291 F.3d at 332.

**1**

To show that the City's training was inadequate, the Valles presented evidence that the City chose not to implement a 2004 proposal for additional mandatory CIT training, prepared at the direction of the Executive Assistant Chief of Police. According to the proposal, CIT training is "a proven curriculum for helping officers safely de-escalate situations involving individuals in serious mental health crises." The 2004 proposal made two recommendations relevant here: (1) that *all* patrol officers be required to complete twenty-four hours of CIT training, and (2) that all patrol *sergeants* be required to complete CIT training.

The first proposal was intended to address the underutilization of CIT officers. Lieutenant Mike Lee, of the police department's Mental Health Unit, testified that CIT training gives officers a basic understanding of mental health

10

issues and appropriate de-escalation and communication tactics. Yet, the proposal noted that CIT-trained officers only handled thirty percent of CIT calls. It also noted the potential liability that could flow from officers not trained in proper de-escalation tactics responding to volatile situations. The proposal specifically noted: "If we dispatch a non-CIT officer to a CIT call and the officer shoots and kills the mental health consumer, the community will ask why we didn't use a CIT officer. We could be liable if a CIT officer was available but not used."

The second recommendation was intended to preclude possible conflicts that could arise between a lower-ranked CIT-trained officer and a higher-ranked non-CIT-trained officer that might result in the higher-ranked officer "overcalling" the CIT officer's suggested approach to the situation. Lieutenant Lee described CIT training as "180 degrees different than . . . typical police officer and law enforcement training." For instance, situations involving mentally ill persons require a greater degree of patience and can require use of CIT tactics for periods as long as twenty-four hours. CIT-trained officers are trained not to "let the pressure of time be a factor in [their] decisionmaking." Supervisors, such as Sergeant Bryant, are supposed to "allow CIT officers to do their jobs with the least amount of interference possible," but "ultimate control" nonetheless rests with the supervisor, not a junior CIT-trained officer. Thus Lieutenant Lee recommended that the City either allow the CIT-trained officer—even if lower ranked—to be in charge of a scene involving a mentally ill person or train all supervisors to a level equal to that of the junior CIT officers so that conflicts would be less likely to occur. The Assistant Chief and Chief of Police considered the proposals but decided not to implement either.[6]

---

[6] The district court determined that the Chief of Police and Executive Assistant's decision not to implement the proposal was an official policymaking decision. The City does not contest this finding.

We agree with the district court that the Valles presented sufficient summary judgment evidence to raise a jury question whether the department's decision not to implement the CIT training recommendations in the 2004 proposal constituted an official policy of failing to adequately train. The Valles also raised a factual question whether a City policymaker (*i.e.*, the Chief of Police) had actual or constructive knowledge of the alleged inadequacy. The 2004 proposal suggests that the City recognized that mental health situations were not being adequately dealt with by CIT-trained officers and that there was a need for additional CIT training. The proposal recommends a course of action, but the City declined to implement those recommendations. The City points to evidence that the Chief of Police and Executive Assistant Chief had to balance the need for training with practical considerations such as budgetary and time constraints, and that instead of adopting the proposal, the City attempted to identify CIT-trained officers for dispatch purposes to increase the percentage of CIT calls actually handled by CIT officers. Although this evidence suggests that the City did not completely ignore the issues raised by the 2004 proposal and sought other ways to deal with them, it highlights the factual dispute whether the City's training and its response to the proposal were inadequate.

**2**

As to the second requirement for municipal liability, the district court found insufficient evidence of causation to survive summary judgment. Plaintiffs must meet a heightened standard of causation in order to hold a municipality liable under § 1983. *See City of Canton*, 489 U.S. at 391–92. Thus, we require that the municipality's failure to train be the "moving force" that caused the specific constitutional violation. *Bryan County*, 219 F.3d at 461. In other words, the plaintiff must establish a "direct causal link" between the municipal policy and the constitutional injury. *Brown*, 520 U.S. at 404. "We have said that the connection must be more than a mere 'but for' coupling

12

between cause and effect. The deficiency in training must be the actual cause of the constitutional violation." *Thompson v. Connick*, 578 F.3d 293, 300 (5th Cir. 2009), *cert. granted*, – S. Ct. –, 2010 WL 1005953 (U.S. Mar. 22, 2010) (No. 09-571) (internal quotations and citations omitted).

The Valles have failed to present sufficient evidence of causation as to the entry of their home. That decision was made by Captain Williams, the head of the tactical SWAT team, who was trained in CIT tactics. Moreover, although CIT Officer Broussard testified that she was neither told nor consulted about making entry into the home, she further testified that she did not disagree with the decision to enter. While we are troubled that Captain Williams never spoke directly with the only CIT officer on the scene prior to ordering the forceful entry of the Valles' home, any alleged lack of CIT training was not the "moving force" in the decision to enter the home.

However, we find that there is sufficient evidence of causation to survive summary judgment with respect to the escalation of force after the officers' entry. The district court reasoned that because CIT Officer Broussard was on the scene, the first goal of the 2004 training proposal—to increase the use of CIT officers in situations such as involved in this case—was accomplished even though that 2004 policy had not been implemented. Although Officer Broussard was present, she was not one of the officers who entered the Valles' home. Moreover, there is no record evidence that the officers who did enter the Valles' home had received any CIT training. Lieutenant Lee emphasized that CIT training is "180 degrees different" from standard patrol officer training and agreed that the "command techniques that are employed to take a criminal suspect into custody can . . . serve to escalate contact with the mentally ill into violence." Furthermore, Assistant Chief Michael Dirden, at the time responsible for internal investigations, testified that he had concerns that the officers who handled the situation were not adequately prepared to do so. In addition, the

Valles' expert opined that "there is a substantially greater likelihood that [Esparza] would [have] survive[d] if the officers going in there are the very best trained, best equipped, best prepared to deal with any kind of eventuality." On the other hand, the City presented some testimony to the effect that CIT training may not have changed the outcome and that Esparza's death was not an incident that would have been addressed by implementation of the 2004 training proposal. At best, the City's evidence raises a factual dispute whether failure to train all of the patrol officers involved in the incident in CIT tactics was a moving force in the precipitous escalation of force following their entry, which violated Esparza's constitutional rights.

**3**

The district court also found that the Valles failed to raise a genuine issue of material fact on the deliberate indifference prong. Although we find this a closer question than the district court apparently did, we ultimately conclude that the Valles did not present evidence sufficient to survive summary judgment. "Deliberate indifference is a stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan County*, 219 F.3d at 457 (quoting *Brown*, 520 U.S. at 410) (internal quotation marks omitted). Deliberate indifference is more than negligence or even gross negligence. *See Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (citation omitted). The Valles must show that "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. Usually a plaintiff must show a pattern of similar violations, and in the case of an excessive force claim, as here, the prior act must have involved injury to a third party. *See Sanders-Burns*, 594 F.3d at 381.

14

The Valles presented some evidence that the City's decision not to implement the 2004 CIT training proposal could potentially lead to the deprivation of constitutional rights.  Contrary to the district court's findings, we think that the 2004 proposal was, at least in part, intended to address the potential for the unconstitutional use of excessive force against mentally ill persons.  Although the proposal does not explicitly state that it was intended to prevent constitutional violations, we think the use of "magic words" denoting that a policy is intended to address constitutional violations or § 1983 liability are unnecessary.[7]  The 2004 training proposal shows that City policymakers were aware that the CIT program was being significantly underutilized, even though it was "proven . . . for helping officers safely de-escalate situations involving individuals in serious mental health crises."  The proposal explicitly acknowledged potential liability (albeit without referencing § 1983) arising from not using CIT officers in situations that called for CIT tactics.  Furthermore, it specifically referenced an example of a non-CIT officer shooting and killing a mentally ill person, a factually similar situation to that here, and specifically referenced liability for failure to train.  The reasonable inference from the proposal's discussion of these liability issues is that the City was concerned about the potential for excessive force liability, even though no explicit mention of "constitutional violations" was made.  Thus, in our view, the proposal tends to show that City officials were aware of the potential for constitutional violations in situations involving mentally ill persons.

---

[7] Requiring that a training proposal include explicit reference to the potential for constitutional violations or § 1983 liability in order to hold a municipality liable for failing to implement such a proposal would have perverse consequences.  If such a rule existed, municipalities could very simply shield themselves from liability by couching training proposals in ambiguous language or otherwise excluding explicit discussion of the potential constitutional injury that the proposal is intended to address.

However, the Valles did not link this *potential* for constitutional violations to a pattern of actual violations sufficient to show deliberate indifference. The proposal does not detail any prior specific instances of the use of excessive force by non-CIT officers. Nor did the Valles elicit testimony that City officials were aware of prior shootings of unarmed mentally ill individuals. The Valles did present some testimony showing that an assistant police chief was, at least, vaguely aware of two shootings of mentally ill persons that occurred *after* Esparza was killed. However, even assuming that these later shootings involved excessive force, they are not sufficient to show that the City was on notice of similar constitutional violations *before* Esparza was killed. *See Davis*, 406 F.3d at 383 (holding that the deliberate indifference standard requires showing "that the failure to train reflects a *deliberate* or *conscious* choice to endanger constitutional rights" (emphases added)). Furthermore, although the 2004 proposal noted that more than 70 percent of all CIT calls were cleared by non-CIT officers, that statistic says nothing about a pattern of constitutional violations because the mere fact of non-CIT officers responding to CIT calls is not itself a violation of any constitutional right. The Valles cannot show a pattern of excessive force without some link between that statistic and specific instances where such a response resulted in constitutional violations. The Valles' expert's testimony, based on two Houston Chronicle articles pre-dating Esparza's shooting, that "[a]t least 10 mentally ill people shot [by Houston officers] were unarmed or carrying objects such as screwdrivers or pieces of wood," is also insufficient. This testimony does tend to suggest that prior shootings of mentally ill persons in fact had occurred, but it does not establish a pattern of constitutional violations. Prior instances must point to the specific violation in question; "notice of a pattern of *similar* violations is required." *Id.* Although it is possible to infer that these prior shootings may have involved the use of excessive force, that inference is too tenuous to survive summary judgment. For

one, a police officer may be justified in using lethal force against a person carrying a screwdriver or other object, depending on the circumstances. *See Ballard v. Burton*, 444 F.3d 391, 402 (5th Cir. 2006) (citing *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003)) ("Use of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others."). Some greater level of detail about these prior shootings is required. *See Davis*, 406 F.3d at 383 ("Prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question.") (citations omitted).

We further note that it is difficult to show deliberate indifference in a case such as this one where the City has implemented at least some training. The very fact that the City trained a corps of officers in CIT tactics, demonstrates that it was not deliberately indifferent to the dangers of police interactions with mentally ill residents. The City considered the proposal, as well as resource constraints, and determined that the best allocation of limited resources and personnel was to keep the CIT training at the then-current levels. We do not mean to say that anytime a municipality must make decisions about resource allocations, such a decision will preclude a finding of deliberate indifference. Indeed, we can imagine scenarios in which a municipality's decision not to allocate resources to training necessary to prevent constitutional violations would constitute deliberate indifference. But that is not the case before us. As we indicated in the discussion of causation, additional training both in terms of the number of officers who were so trained and the quantity of training that each officer received may have made a difference for Esparza. But without a demonstrated link showing constitutional violations, notwithstanding the level of training the City had already implemented, we cannot say that the City was deliberately indifferent.

17

Nor did the Valles present sufficient summary judgment evidence to succeed in showing deliberate indifference under the single incident exception. Proof of deliberate indifference is difficult, although not impossible, to base on a single incident. *Sanders-Burns*, 594 F.3d at 381. The "single incident exception" is extremely narrow; "a plaintiff must prove that the *highly predictable consequence* of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation." *Id.* (citations and internal quotations omitted) (emphasis added). In the one case in which we found a single incident sufficient to support municipal liability, there was an abundance of evidence about the proclivities of the particular officer involved in the use of excessive force. *See Bryan County*, 219 F.3d at 462 (finding deliberate indifference based on the police officer's known "personal record of recklessness and questionable judgment," inexperience, exuberance, and involvement in forcible arrest situations). On the other hand, we have rejected claims of deliberate indifference even where a municipal employer knew of a particular officer's propensities for violence or recklessness. *See, e.g.*, *Davis*, 406 F.3d at 382–85 (finding no deliberate indifference even though city was aware that officer fired weapon inappropriately, had a propensity for violence, and had received citizen complaints about the officer); *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998) (rejecting claim of deliberate indifference even though evidence showed officer was extremely stressed, may have had a quick temper, and was aggressive). This court has been wary of finding municipal liability on the basis of a single incident to avoid running afoul of the Supreme Court's consistent rejection of respondeat superior liability. *See, e.g.*, *Pineda*, 291 F.3d at 334–35 (noting that the court rarely finds municipal liability for a failure to train claim on the basis of a single incident).

Here, the Valles did not allege or offer evidence that the officers who responded to their call had a propensity for using excessive force, violence, or were otherwise reckless. Our case law does not specifically require evidence of such character traits, but such evidence certainly is probative in determining that a "highly predictable" consequence of sending the particular officers into a particular situation would be a constitutional violation. Rather, the Valles attempted to show that a "highly predictable" consequence of sending non-CIT officers to a situation involving a mental health consumer would be an unconstitutional use of excessive force. "The single incident exception requires proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights and the need for additional or different police training." *Gabriel v. City of Plano*, 202 F.3d 741, 745 (5th Cir. 2000) (citing *Brown*, 520 U.S. at 409).

Although the evidence shows the possibility—perhaps even the likelihood—of recurring situations involving mental health consumers, the evidence is far more equivocal on the question whether there was an obvious potential for the violation of constitutional rights and an obvious need for more or different training. The Valles presented evidence that in the three years preceding Esparza's shooting, Houston police received approximately forty calls per day involving situations in which CIT tactics would be appropriate. Less than thirty percent of those calls were actually answered by CIT-trained officers. Coupled with Lieutenant Lee's testimony that general patrol training is "180 degrees different" from CIT training, these figures suggest that it was, if not obvious that more CIT training was necessary, at least an issue on the City's radar. However, as discussed above, the Valles did not produce evidence to meet the high hurdle of showing that excessive force was an obvious consequence of non-CIT officers responding to CIT situations. Indeed, in considering the single-incident exception, "[s]everal panels of this court . . . have reviewed cases where

19

a decision not to train was made long before the alleged violation, and found that the lack of any similar violations indicates that a violation could not be the 'highly predictable consequence' of failing to train." *Thompson*, 578 F.3d at 299 (citations omitted). "This approach reflects common sense: if there have been thousands of opportunities for municipal employees to violate citizens' constitutional rights, and yet there have been no previous violations, then the need for training is simply not 'so obvious.'" *Id.* at 299–300; *see also Conner v. Travis County*, 209 F.3d 794, 797 (5th Cir. 2000) (holding that if failure to train was "so likely to result in the violation of constitutional rights," the plaintiff "would be able to identify other instances of harm arising from the failure to train"). We find the actions and decisions of the officers involved in this unfortunate shooting to be very troubling, indeed. However, the Valles did not present sufficient evidence to show that the *highly predictable consequence* of sending non-CIT officers in response to their call for help would result in the shooting of their son.

## V

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in the City's favor.