PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

MICHAEL LOVERN, SR.,
Plaintiff-Appellant,

v.

MARK A. EDWARDS, Individually and

No. 98-2227

in his official capacity as
Superintendent of the Henrico
County Public Schools,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CA-98-397-3)

Argued: June 11, 1999

Decided: August 31, 1999

Before WIDENER, NIEMEYER, and KING, Circuit Judges.

_____

Affirmed by published opinion. Judge King wrote the opinion, in
which Judge Widener and Judge Niemeyer joined.

_____

COUNSEL

ARGUED: Daniel A. Carrell, CARRELL & RICE, Richmond, Vir-
ginia, for Appellant. William Gray Broaddus, MCGUIRE, WOODS,
BATTLE & BOOTHE, L.L.P., Richmond, Virginia, for Appellee.
ON BRIEF: A. Eric Kauders, Jr., MCGUIRE, WOODS, BATTLE &
BOOTHE, L.L.P., Richmond, Virginia, for Appellee.

**OPINION**

KING, Circuit Judge:

Appellant Michael Lovern sued appellee Mark A. Edwards, the Superintendent of the Henrico County Public Schools ("Superintendent" or "Superintendent Edwards"), in the district court for the Eastern District of Virginia, asserting subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Lovern's complaint alleged that Superintendent Edwards violated Lovern's constitutional rights by prohibiting Lovern from entering the property of the Henrico County Public Schools ("HCPS"), and Lovern sought redress under 42 U.S.C. § 1983 in the form of injunctive relief and damages. After conducting an evidentiary hearing, the district court denied Lovern's motion for injunctive relief, declined to exercise jurisdiction over Lovern's claims, and dismissed the case without prejudice.

Lovern timely appealed to this court, and we possess jurisdiction pursuant to 28 U.S.C § 1291.**1** Because Lovern's claims fail to pass muster under the substantiality doctrine, we affirm the district court's dismissal.

I.

A.

Lovern is the non-custodial parent of three children who attend Henrico County public schools near Richmond, Virginia. His former wife, the custodial parent and the children's legal guardian, also lives in the same area of Virginia. In February 1997, Lovern moved from Texas to Virginia. Lovern acts as president of a private corporation, Trial Management Associates, Inc., that specializes in "federal public interest cases," and which, according to its letterhead, maintains offices in Fort Worth, Texas; Richmond, Virginia; and Chicago, Illi-

_____

**1** Prior to oral argument, the Superintendent rescinded the ban on Lovern's entry onto HCPS property, and Lovern withdrew his claim for injunctive relief. Lovern's appeal is therefore limited to the dismissal of his claim for damages.

2

nois. In this capacity, Lovern supervises a full-time staff attorney and a number of volunteer attorneys.

Shortly after Lovern moved to Virginia, the basketball coach of his son's junior varsity team at J. R. Tucker High School in Henrico County was evicted from a game. Lovern promptly contacted Tucker's principal about the coach's eviction, insisted that the principal refuse to comply with the mandatory one-game suspension of the coach, and sought to have the principal appeal the coach's eviction. When his requests to the principal failed, Lovern immediately sought intervention from higher authorities. He contacted Superintendent Edwards' office, where the handling of his complaints consumed a substantial amount of the employees' time.

On November 13, 1997, to Lovern's apparent disappointment, his son was not selected by the basketball coach to play on Tucker's varsity basketball team. Lovern immediately phoned the coach, both at work and at home, to complain about his son's exclusion. Lovern also telephoned the Tucker principal's office a number of times to register complaints concerning the coach's decision. Lovern then attended a November 26, 1997 evening basketball practice at Tucker and, for approximately 25 minutes, attempted to address the situation with the coaches.

On December 5, 1997, Tucker's principal wrote to Lovern to explain and reemphasize to him that his children's mother had requested that the school provide her with notice and opportunity to be present at any of the school's discussions about her children.[2] The letter explained that, as a result, any such meetings had to be scheduled in advance.[3] The principal's letter of December 5, 1997, also

_____

[2] At the July 14, 1998 evidentiary hearing, Lovern testified that although he was under a court order to pay $600 per month for child support, he had made only two payments since February 1997.
[3] The principal's December 5, 1997 letter to Lovern stated in pertinent part:

> The purpose of this letter is to reemphasize the process by which you should bring your concerns regarding Tucker High School to my attention. Through discussion with[the children's

3

informed Lovern that he should otherwise limit his entry onto school property to events scheduled for and open to the public.[4] Lovern felt the principal's December 5 letter violated his constitutional rights. He subsequently telephoned the principal, learned the name of the employee who drafted the letter, and then phoned her, both at her

_____

> mother], she has requested us to inform and include her in all discussions regarding your children. As the physical legal custodian [sic] of the children, [their mother] has the authority to make relevant educational decisions for your children, both of an academic and extracurricular nature. We have shared this with you on several occasions.
>
> . . . [O]n Wednesday, November 26, 1997, you entered the Tucker gymnasium . . . . The coaches were involved in getting their basketball practice started and your interruption was inappropriate. As I have explained to you on several occasions, you may bring your concerns regarding the children's education to [their mother's] attention, and if necessary, all parties will meet to discuss any issues.
>
> You have made it clear to several Henrico County School staff that you are taking legal action regarding concerns about Henrico County Schools. . . .
>
> Please be advised that any future contact with the school should be arranged through [the children's mother] and me in reference to your children or through the legal process for other concerns. Under no circumstances are you to come on to Tucker High School property during school hours without my express consent and authorization except to attend scheduled activities open to the public. Any violation of this direction on your part will result in trespassing charges being filed against you. If you have any questions regarding this letter, you may contact me . . . .

J.A. 77.

[4] Lovern testified at the preliminary injunction hearing in the district court, and admitted that he "was constantly being accused of threatening people." J.A. 53. Lovern also acknowledged that, in an unrelated incident, he "physically went to [the Department of Motor Vehicles] and requested an explanation . . . . The only thing[he] got was asked to leave the building." J.A. 72-73.

4

office and at her home, complaining about the letter's contents. As a result, the principal sent Lovern a follow-up letter on December 15, 1997, to explain that this established procedure was for the purpose of maintaining an orderly school atmosphere, and was not intended in any respect to limit Lovern's access to information about his children's education.[5]

On December 10, 1997, Lovern attended a meeting of the Henrico County Board of Supervisors and alleged to the Board that an investigation performed by his business had discovered that HCPS officials were misusing public funds. He asserted that HCPS's long history of paying litigation costs of its board members and school officials was illegal and corrupt.[6] Lovern requested an official investigation, and was referred to the HCPS Board.

The next week, on December 18, 1997, Lovern attended an HCPS Board meeting, publicly raised the same "corruption" allegations, and requested a private meeting with the Board members. By letter on January 9, 1998, the HCPS Board referred Lovern to the HCPS administration. Lovern then contacted Superintendent Edwards, and also called a number of other HCPS officials, to talk about his corruption allegations against HCPS. On January 14, 1998, Superintendent Edwards informed Lovern in writing that he was barred from HCPS's property, due to his continuing "pattern of verbal abuse and threaten-

_____

[5] The principal's December 15, 1997 follow-up letter to Lovern stated:

> Please understand that while we encourage parents to take an interest in their children's education, we have an obligation to our staff and students to maintain an atmosphere of respect, order, and professionalism in the school. This procedure is not established for the purpose of limiting your access to information about your children's education, but to initiate an orderly and productive method of addressing concerns.

J.A. 78.

[6] Contrary to Lovern's assertions, a school board in Virginia is authorized to pay litigation costs of school officials and school board members, if the costs arise from the exercise of their official duties. See Va. Code § 22.1-82.

5

ing behavior towards school officials, including staff and School Board members."[7]

B.

Lovern reacted to the Edwards Letter by threatening to publicly expose "corruption" by HCPS's officials and threatening to initiate legal action against a variety of public entities and officials. On March 9, 1998, Lovern sent a letter jointly addressed to Henrico County Officials, the County Attorney, and the Henrico County School Board, among others. In this letter, he complained that:

> Mr. Edwards [sic] letter is nothing more than an attempt to shut me up in a public setting (school board meeting, sporting event, etc..) [sic], where other parents will hear about [the corrupt school / county officials'] indiscretions and incorrigible behavior.
>
> . . . .
>
> If you do not [totally rescind your threats of trespass by 4:00 p.m. today] I will immediately forward a legal demand letter for monetary damages. If those demands are not met I will file suit in federal court ASAP seeking injunctive relief and monetary damages including punitives in the amount of <u>Twenty Five Million Dollars ($25,000,000.00)</u>.

_____

[7] Superintendent Edwards' hand-delivered letter of January 14, 1998 (the "Edwards Letter") stated:

> The purpose of this letter is to inform you that as of this date you may no longer enter the premises of any Henrico County School Board property. This includes all school buildings, as well as Glen Echo and the Central Office. The reason for this is your continued pattern of verbal abuse and threatening behavior towards school officials, including staff and School Board members. If you do enter upon any school board property, trespassing charges will be filed pursuant to Va. Code §18.2-119 and §18.2-128.

J.A. 108.

J.A. 109-113 (emphasis in original). The letter's list of courtesy copies included the Department of Justice's "Civil Rights Division, Criminal Section."

Two days later, on March 11, 1998, Lovern sent a purported "demand letter" to the County Attorney. This letter named various public entities and nine individuals as potential defendants in his lawsuit. The proposed defendants included the local police chief, who had apparently informed Lovern that the police would enforce the county's trespass laws against him. In this letter, Lovern also accused Superintendent Edwards and unnamed county officials of several criminal acts, and complained that:

> There has been a cover-up of illegal activity.
>
> . . . I now provide you with this demand letter. You have until noon Friday, March 13, 1998 to settle the claims. . . .
>
> You can contact me with any offer you wish to make as I am lead counsel on this case. No initial offers will be made by me as I will not negotiate against myself.

J.A. 114-16 (emphasis added).[8]

Two weeks later, on March 25, 1998, having already named the Henrico County Board of Supervisors as potential defendants in the "demand letter" for his purported lawsuit, Lovern wrote to the Board of Supervisors on business letterhead of Trial Management Associates, Inc., to propose that he assist their investigation of his "corruption" allegations:

> I wish that the Board had taken me seriously in December as this is going to be a great embarrassment to the county.
>
> If you would like my help on this matter I will consider

_____

[8] Lovern is not a licensed attorney. However, as pointed out above, he testified that his work involves supervising attorneys who conduct "public interest" litigation.

7

such depending on your request, and its effect on the [sic] my other claims. I hope you do the right thing before the County's integrity is completely destroyed.

J.A. 117-18.

Simultaneously, in a March 25, 1998 letter to Superintendent Edwards, Lovern accused Edwards of "using [Lovern's] children in [Edwards'] incorrigible web of deceit and corruption." The letter also informed Edwards that:

> Your decision [excluding me from the school's property] is another overt act in furtherance of your conspiracy, actionable in Federal Court. I will amend my law suit again.
>
> For you to call yourself an educator is unbelievable. I hope your children never find out the kind of person you really are. I can assure you Mr. Edwards that because you have intentionally inflicted pain on my children, who are innocent pawns in your devious game of public corruption, I will spend the rest of my life using the legal system to make you accountable, using civil litigation to take from you every penny you have ever earned.
>
> In addition your actions today give me the necessary evidence to go forward with a criminal complaint . . . punishable up to ten years in prison. You should be ashamed of yourself.

J.A. 79-80.

Thereafter, on March 30, 1998, Lovern sent another letter on the letterhead of Trial Management Associates, Inc., with attachments, to the principals of two high schools with upcoming baseball games scheduled against Tucker High. In this letter, Lovern again accused both the School Board and school administrators of criminal and civil violations of the law. He informed the principals that unless they demanded in writing that Superintendent Edwards rescind the Edwards Letter, they would also become defendants in Lovern's lawsuit. Lovern threatened:

8

> I hope you choose to be on the side of the law. Please don't let corrupt County Officials drag you down and tarnish the good name of your schools. . . .
>
>    . . . This is a serious matter with severe consequences. Be smart and I will not take advantage of you.

J.A. 83. Lovern enclosed a draft complaint with this correspondence. This draft complaint had blank spaces reserved for twenty-five defendants. It identified as defendants, among others, an FBI agent and an Assistant United States Attorney in Richmond, as well as Henrico County police officials, who Lovern asserted had refused to protect his rights. J.A. 82-106. According to Lovern, "[a]nother overt act in furtherance of the conspiracy" was committed when the FBI agent and the Assistant United States Attorney refused his requests for federal intervention. J.A. 98-99. On June 10, 1998, Lovern wrote to Virginia's Secretary of Education, also on business letterhead, and complained that the HCPS Board voted to adopt the Edwards Letter. Lovern said that he had "no intention of dealing with the School Board anywhere except in Federal Court," and threatened to have Edwards' "Superintendent's license" taken from him. J.A. 119.

C.

On June 26, 1998, Lovern filed his complaint against Superintendent Edwards in this action, alleging that the Superintendent's conduct violated 42 U.S.C. § 1983 and the First and the Fourteenth Amendments of the Constitution, through deprivation of Lovern's constitutional rights of free speech, "right of petition," and "parental rights." The complaint also asserted that Superintendent Edwards had conspired to violate Lovern's constitutional rights. See 42 U.S.C. § 1985.

After the July 14, 1998 evidentiary hearing on Lovern's motion for a preliminary injunction, the district court denied Lovern's request for injunctive relief, ruling that Lovern could not show either irreparable harm or the likelihood of prevailing on the merits of his claims.[9] The

_____

[9] The court also found that Lovern completely lacked credibility in that there was "compelling" evidence that Lovern was "really trying to

court then dismissed the complaint against Superintendent Edwards without prejudice.

II.

A.

We review de novo the district court's determination of its subject matter jurisdiction. See, e.g., Folio v. City of Clarksburg, W. Va., 134 F.3d 1211, 1214 (4th Cir. 1998). As we have recognized, a federal court is obliged to dismiss a case whenever it appears the court lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3); Goldsmith v. Mayor & City Council of Baltimore, 845 F.2d 61, 64 (4th Cir. 1988). Indeed, the absence of jurisdiction may be raised at any time during the case, and may be based on the court's review of the evidence. See, e.g., Gibbs v. Buck, 307 U.S. 66, 72 (1939). Determining the question of subject matter jurisdiction at the outset of the litigation is often the most efficient procedure. Ruhrgas AG v. Marathon Oil Co., 119 S. Ct. 1563, 1572 (1999).

A district court may address its lack of subject matter jurisdiction in two ways. Fed. R. Civ. P. 12(b)(1); Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). The court may find insufficient allegations in the pleadings, viewing the alleged facts in the light most favorable to the plaintiff, similar to an evaluation pursuant to Rule 12(b)(6). Id. Alternatively, after an evidentiary hearing, the court may weigh the evidence in determining whether the facts support the jurisdictional allegations. Id. Where the court conducts an evidentiary hearing and engages in fact-finding to determine the jurisdictional question, a problem may arise if the jurisdictional facts are intertwined with the merits of the dispute; if this occurs, ordinarily the entire dispute is appropriately resolved by a proceeding on the merits. Id. However, there are circumstances where, as here, the court has conducted an evidentiary hearing, the jurisdictional facts are related to the merits of

_____

advance the interests of his company . . . as opposed to his concern about the welfare of his children." J.A. 74. The district court opined that "this case is a monument to what ought not to be in a federal court," and found that Lovern "engag[ed] in tactics to try to intimidate everybody to force them to do his bidding." J.A. 74-75.

10

the case, and the district court may yet find the substantiality doctrine to preclude the exercise of subject matter jurisdiction.

It is elementary that the burden is on the party asserting jurisdiction to demonstrate that jurisdiction does, in fact, exist. Thomson v. Gaskill, 315 U.S. 442, 446 (1942); Goldsmith , 845 F.2d at 63-64. The mere assertion of a federal claim is not sufficient to obtain jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3). Davis v. Pak, 856 F.2d 648, 650 (4th Cir. 1988) (dismissing § 1983 claims for lack of subject matter jurisdiction because the federal claims were insubstantial and were pretextual state claims). As we recognized in Davis, "Federal jurisdiction requires that a party assert a substantial  federal claim." Id. (citing Hagans v. Lavine, 415 U.S. 528, 536 (1974)) (emphasis added). In Davis, we confirmed that where a claim is obviously without merit, Hagans precludes a federal district court from exercising its jurisdiction.**10** Id. at 651.

The Hagans doctrine of substantiality is especially important where a wholly frivolous federal claim serves as a pretext to allow a state-law issue, the real focus of the claim, to be litigated in the federal system. Id. As we warned in Davis, federal courts must guard against the litigant who frames a pretextual federal issue solely for the purpose of having a state-law claim adjudicated in the federal system; Article III of the Constitution forbids this practice. Id.; see also Fleet Bank,

_____

**10** In our Davis decision, Judge Hall endorsed the continuing viability of the substantiality doctrine, as follows:

> [In Hagans, the Supreme] Court noted:
>
> Over the years, this court has repeatedly held that the federal courts are without power to entertain claims otherwise within their jurisdiction if they are "so attenuated and insubstantial as to be absolutely devoid of merit, wholly insubstantial, obviously frivolous, plainly insubstantial, or no longer open to discussion." (citations omitted).
>
> While emphasizing that this insubstantiality threshold is a difficult one to meet, the Court concluded that the substantiality doctrine "remains the federal rule and needs no reexamination here" (citation omitted).

Davis, 856 F.2d at 650-61.

11

Nat'l Ass'n v. Burke, 160 F.3d 883, 892 (2d Cir. 1998) (concluding that an attenuated federal claim presents no substantial federal question over what is primarily a state-law claim, in which state administrative bodies have the primary right to take evidence and make findings of fact). Put simply, the Constitution does not contemplate the federal judiciary deciding issues of state law among non-diverse litigants.[11] Davis, 856 F.2d at 652.

B.

Our disposition of Lovern's appeal is controlled by our decision in Davis. Applying the Davis principles to this case, Lovern's claims are bottomed on alleged violations of his First Amendment speech and Fourteenth Amendment substantive due process rights. These purported violations flow from the decision of Superintendent Edwards, set forth in the Edwards Letter, to bar Lovern's entry onto school

_____

[11] As the district court emphasized, Lovern had recourse to appropriate state process to remedy any grievance arising from a school board's action against him. Virginia law provides for state court review of actions of a school board, and requires the state court to sustain such actions unless the board exceeded its authority, acted arbitrarily or capriciously, or abused its discretion. See Va. Code § 22.1-87.

Lovern, however, argues that the available statutory processes are inapplicable here for two reasons: (1) the statute requires the complained-of school board action to arise from a formal meeting of the board, which did not occur here; and (2) in any event, the Edwards Letter was never acted on by the HCPS Board. Both of these arguments are specious.

As to the first, the plain language of the Virginia statute provides that a parent may complain of any "action of the school board"; there is no basis to infer a statutory limitation only to school board actions that are taken at formal meetings, and Lovern provides no authority to support that such an inference is proper. See Va. Code § 22.1-87.

Further, Lovern's contention that there was no HCPS Board action in this case flatly contradicts the record, since he acknowledged in his June 10, 1998 letter that the HCPS Board had adopted the Edwards Letter. Moreover, Lovern admitted that he chose not to seek a hearing on the matter from the HCPS Board and thus that he elected not to pursue his available state remedies.

12

property because of Lovern's "continued pattern of verbal abuse and threatening behavior towards school officials." **12**

School officials have the authority to control students and school personnel on school property, and also have the authority and responsibility for assuring that parents and third parties conduct themselves appropriately while on school property. See, e.g., Carey v. Brown, 447 U.S. 455, 470-71 (1980) (the Constitution does not leave state officials powerless to protect the public from threatening conduct that disturbs the tranquility of schools); Goss v. Lopez, 419 U.S. 565, 582-83 (1975) (a school official's determination of the existence of an ongoing threat of disruption of the academic process can justify immediately removing a person from school property). While the specific contours of the authority and responsibility of school officials are defined by state law, such officials should never be intimidated into compromising the safety of those who utilize school property. Cf. Epperson v. Arkansas, 393 U.S. 97, 104 (1968) (public education is by and large committed to the control of state and local authorities); Bystrom v. Fridley High Sch., Indep. Sch. Dist. No. 14, 822 F.2d 747, 751 (8th Cir. 1987) (in determining the invalidity of a First Amendment violation claim, the "restraint [applies] only on [high school] property. The difference is decisive.").

Here, HCPS did not seek to affect Lovern's conduct except on HCPS property. As to Lovern's conduct on the school's property, HCPS initially advised Lovern of the proper process if he desired to discuss his children's schooling and other matters relating to HCPS. Lovern was provided ample opportunity to air his "corruption" allegations, both to the school board and in numerous discussions with school officials. Under the circumstances, the school administration concluded that Lovern's conduct constituted a "continuing pattern of verbal abuse and threatening behavior towards school officials," and requested that Lovern not enter HCPS property.**13** The right to communicate is not limitless. Carey, 447 U.S. at 470.

_____

**12** Counsel notified this court in March 1999, during the pendency of this appeal, that the Superintendent has rescinded the prohibition, subject to the condition that Lovern, "while on School property, conform his conduct and behavior to the standard expected of all patrons and visitors."

**13** Although Lovern asserts that the Edwards Letter was intended to prevent him from publicly exposing corrupt school officials and thereby vio-

13

We are simply unable to conclude, on this record, that Lovern's constitutional rights were "directly and sharply" implicated by HCPS's prohibition against him. See Epperson, 393 U.S. at 104; see also, e.g., Bystrom, 822 F.2d at 750-51 (secondary school's speech restraint that applies only on school property and was implemented to assure that school resources were devoted primarily to education, and to preserve "some trace of calm" on the property, was not unconstitutional).

Lovern's claims against Superintendent Edwards in this case are plainly insubstantial and entirely frivolous. His assertions that school administrators must provide him with boundless access to school property are "obviously without merit." See Davis, 856 F.2d at 650. As the district court noted, "this case is a monument to what ought not to be in a federal court." In these circumstances, application of the substantiality doctrine to dismiss this case is particularly appropriate.

III.

Pursuant to the foregoing, we conclude that the district court lacked subject matter jurisdiction. We therefore affirm the judgment of the district court in dismissing this case.

AFFIRMED

_____

lated his rights, he does not dispute that his conduct towards school personnel was perceived as verbally abusive and threatening. Lovern also does not dispute that the school officials did permit him to air his concerns about school "corruption" numerous times while he was on school property, and that after he received the Edwards Letter, he continued to be free to speak and publicize his complaints about school officials' "corruption," so long as he was not on school property.

14