Khatia **MADRID**, et al., Plaintiffs,

v.

David G. **ANTHONY**, Ed.D, in his Official Capacity as the Superintendent of Cypress–Fairbanks Independent School District, Defendant.

Civil Action No. H–06–1454.

United States District Court,
S.D. Texas,
Houston Division.

Sept. 25, 2007.

Maria Elena Castellanos, Mario Caballero, Houston, TX, for Plaintiffs.

Christopher B. Gilbert, Bracewell Giuliani LLP, Houston, TX, for Defendant.

## *ORDER*

DAVID HITTNER, District Judge.

Pending before the Court is Defendant David G. Anthony's Motion for Summary Judgment (Document No. 23). Having considered the motion, submissions, and applicable law, the Court determines the motion should be granted.

## *BACKGROUND*

This lawsuit arises from alleged violations of students and parents' First Amendment rights at school. Specifically, Plaintiffs Lourdes B. Martinez ("Lourdes") and Jennifer Quintero ("Jennifer") (collectively, "Students") and their parent repre-

sentatives, Khatia Madrid and Maria Martinez (collectively, "Parents") bring claims against Defendant David G. Anthony, in his Official Capacity as the Superintendent of Cypress–Fairbanks Independent School District ("Defendant" or "C–FISD").[1] The Parents and Students (collectively, "Plaintiffs") allege Defendant violated their First Amendment rights because they were not allowed to freely express their political viewpoints at Cypress Ridge High School ("Cy–Ridge" or "school") or assemble at the school.[2] According to Cy–Ridge principal, Claudio Garcia ("Principal Garcia"), who is Hispanic, Cy–Ridge has some history of racial tension among the Hispanic, African–American, and Caucasian racial groups in the student body, and he believes some fights among students have been motivated by race.[3] This background formed the basis of his decisions during the events at issue.

The facts giving rise to this case stem from a walk out that occurred on Monday, March 27, 2006 when about 300 students at Cy–Ridge walked out of school to protest pending immigration reform legislation in Congress ("Monday Walk out"). Many students, most of whom were Hispanic, wore white t-shirts that read We Are Not Criminals to express their opinion of the pending legislation. The same day, Principal Garcia asked the students who participated in the Monday Walk out to come inside the school and congregate in the school auditorium.[4] Once the students gathered in the auditorium, Principal Garcia allowed them to voice their opinions in English and Spanish concerning immigration.[5] However, he also explained that walking out of school violated state truancy laws and could be dangerous to them.[6] He emphasized that students who participated in the walk out that day would not be disciplined, but students who participated in any future walk out would be disciplined.

Throughout the day on Monday, Principal Garcia heard rumors that some students were planning another walk out for Tuesday, March 28, 2006. Additionally, the Cy–Fair administration and faculty heard that Caucasian and African–American students were planning to wear t-shirts that read Border Patrol to antagonize the Hispanic students who were pro-

1. Some of the students and their parent representatives have been dismissed by stipulation of the parties. In order to avoid confusion created by the remaining parties' similar names, the Students are referred to by their first names.

2. Because Plaintiffs filed suit against David G. Anthony in his official capacity, the Defendant in this case is the Cypress–Fairbanks School District. *See Wilkerson v. Columbus Separate Sch. Dist.,* 985 F.2d 815, 819 (6th Cir.1993) (affirming a district court's dismissal of individual defendants sued in their individual capacities because official capacity suits are in effect suits against the school district); *see also Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (noting that suits against state agents are just another way of pleading actions against the state).

Thus, the Court refers to the Defendant as C–FISD.

3. Apparently, each racial group comprises roughly one-third of the student population.

4. Also on Monday, one of the social studies teachers began organizing a committee to meet after school to help students learn about the pending immigration legislation. On Tuesday, the students were invited to sign up at lunch to participate, and the first meeting was held on Thursday, March 30, 2006

5. The Principal gave students their choice of language—Spanish or English.

6. The Court notes that apparently no complaints were received due to the fact that the students expressed support or opposition in Spanish, not in English.

testing the immigration legislation.[7] Ostensibly in an effort to prevent a racial riot that threatened to erupt from the escalating tension among the students, Principal Garcia announced on Tuesday morning that students wearing unauthorized t-shirts would be sent to the office.[8] If a student was sent to the office, he or she was asked to change shirts or wear a t-shirt provided by the school for the remainder of the day.[9] Principal Garcia also asked the teachers to keep all students in the classrooms as much as possible during the day to keep students from roaming the halls and potentially causing disruptions.[10]

The Students aver that on Tuesday, their respective teachers retaliated against them for participating in the political protest. Specifically, Lourdes avers that her teacher, Doris Thomas ("Mrs. Thomas") would not allow her to use the restroom during class on Tuesday morning because she was wearing a We Are Not Criminals t-shirt as a political protest, but allowed an African–American to use the restroom during class. Furthermore, Lourdes alleges she went to the restroom during class without Mrs. Thomas' permission, and in response, Mrs. Thomas gave her a disciplinary referral and sent her to the office.[11] With respect to Jennifer, she alleges her teacher Jeff Burnthorn ("Mr. Burnthorn") denied her request to use the restroom but allowed a Caucasian student to use the restroom during class.[12]

Despite Principal Garcia's warning to the students on Monday, a second walk out occurred on Tuesday ("Tuesday Walk out"). Although the administration and faculty encouraged the students to return to class, about 130 students refused and walked out.[13] Most did not return to school.

7. Other rumors indicated someone was going to pull a gun at lunch and something was going to happen on the buses going home.

8. Principal Garcia contends he intentionally did not refer to the specific t-shirts at issue because he did not want to humiliate any students wearing them.

9. Principal Garcia stated in a declaration filed in this case that he did not think the We Are Not Criminals or Border Patrol t-shirts were inappropriate, but he prohibited these shirts because they would cause fights among student groups.

10. Plaintiffs do not dispute that the teachers were told to keep all students out of the halls, not just Hispanic students.

11. Mrs. Thomas denies she prohibited Lourdes from using the restroom during class, and Lourdes now concedes Mrs. Thomas never disciplined her. Lourdes also testified she could not remember the name of the African–American student Mrs. Thomas allegedly allowed to use the restroom during class Defendant concurs there are no records to indicate Mrs. Thomas disciplined Lourdes, but submits evidence that Lourdes received a disciplinary report that day from her science teacher, Nicole Joiner ("Ms. Joiner"), a Caucasian. The school records show that Ms. Joiner wrote up a discipline referral regarding Lourdes' behavior. Apparently, Ms. Joiner told Lourdes that she could not use the restroom during class until she finished her work. When Lourdes responded inappropriately, Ms. Joiner wrote up a discipline referral slip. Although Lourdes denies she responded inappropriately, as specified in the disciplinary slip, she concedes Ms. Joiner told her she could not go to the restroom during class until she finished her work.

12. In her deposition, Jennifer could not remember the name of the Caucasian student Mr. Burnthorn allegedly allowed to use the restroom during class. Mr. Burnthorn testified he did not allow any students to use the restroom during class or go to their lockers that day because Principal Garcia requested that students be kept out of the hallways.

13. The students who walked out on Tuesday hiked four miles to another high school, disrupting traffic by darting into a busy street along the way. Thus, they were given a ticket for disturbing the peace.

Having been warned they would not be allowed to participate in another walk out without being disciplined, the students were suspended on Wednesday, Thursday, and Friday of that week. Because the students did not learn of their suspension until they returned to school on Wednesday, March 29, 2006, school administrators called the parents of most of the 130 students who participated in the Tuesday Walk out and asked them to pick up their students to commence that student's suspension period. When some parents arrived, including the Plaintiff Parents, they demanded to meet with Principal Garcia, demanded an explanation for the suspension, and approached other parents for a list of students who were being punished.

Finding he could not simultaneously meet with such a large number of parents, Principal Garcia asked them to schedule an appointment.[14] Because some parents were causing a disturbance, they were asked to move outside the school building in order to maintain an orderly process of suspension with regard to the remaining students who were being picked up and to allow other arriving parents access to the building and office. After some parents continued to complain inside the building, the Harris County Constable, who is permanently assigned as school security, asked them to leave the campus.

As a result of these events, on April 28, 2006, Plaintiffs filed suit against Defendant, alleging it had a pattern and practice of prohibiting students and parents from expressing their political viewpoints. Specifically, Plaintiffs allege Defendant violated Lourdes' First Amendment rights by denying her access to the restroom during class in retaliation for expressing her polit-

ical viewpoint by wearing a We Are Not Criminals t-shirt. Plaintiffs also allege Defendant violated the Fourteenth Amendment equal protection clause by denying Students access to the restroom during class based upon their race and national origin. Furthermore, Plaintiffs aver Defendant denied the Parents' First Amendment right of peaceable assembly. Plaintiffs aver they are entitled to relief under 42 U.S.C. § 1983 (2006) (" § 1983"). Defendant moves for summary judgment arguing it is not liable under § 1983 because no policy or custom was violated, and it did not violate any of Plaintiffs' rights under the First or Fourteenth Amendment.

## STANDARD OF REVIEW

Summary judgment is proper when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV.P.56(c). The court must view the evidence in a light most favorable to the non-movant. *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir.1997). Initially, the movant bears the burden of presenting the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to come "forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting FED. R. CIV. P. 56(e)). "A dispute about a material fact is 'genuine' if

---

**14.** Principal Garcia asked the parents to make an appointment because there were too many parents demanding a meeting and because he sought to maintain the privacy con-

cerns provided by the Family Education Rights and Privacy Act, 20 U.S.C. § 1232g (2006).

the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 956 (5th Cir.1993) (citation omitted).

The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conclusory allegations unsupported by specific facts will not prevent an award of summary judgment; the plaintiff cannot rest on his allegations to get to a jury without any significant probative evidence tending to support the complaint. *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio,* 40 F.3d 698, 713 (5th Cir. 1994). Thus, the non-movant's burden cannot be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *Doe v. Dallas Indep. Sch. Dist.,* 153 F.3d 211, 215 (5th Cir.1998). It

is not the function of the court to search the record on the non-movant's behalf for evidence which may raise a fact issue. *Topalian v. Ehrman,* 954 F.2d 1125, 1137 n. 30 (5th Cir.1992).

## LAW AND ANALYSIS

Plaintiffs allege Defendant is liable under § 1983 for violations of their constitutional rights and intentional racial discrimination.[15] In response, Defendant argues Plaintiffs have not demonstrated C–FISD had an official policy or firmly entrenched custom that contributed to Plaintiffs' alleged constitutional injury. Moreover, Defendant asserts it did not violate Plaintiffs' First Amendment rights or retaliate against them. Thus, the Court must determine whether C–FISD is liable under § 1983 for violating Plaintiffs' First Amendment rights.

Section 1983 provides in relevant part: "Every person who, under color of any statute ... subjects, or causes to be sub-

---

**15.** Plaintiffs assert a claim for racial discrimination under § 1983 because Jennifer and Lourdes were allegedly denied the right to use the restroom during class when other students outside their protected class were allowed to use the restroom. In moving for summary judgment, Defendant contends Plaintiffs fail to create a genuine issue of fact because they could not identify the non-Hispanic students allegedly allowed to go to the restroom. In order to state a claim for racial discrimination under § 1983, a plaintiff must demonstrate the governmental official was motivated by intentional discrimination on the basis of race. *Coleman,* 113 F.3d at 533. Thus, Plaintiffs must raise a genuine issue of fact that C–FISD intentionally discriminated against them on the basis of race. *See id.*

Even if the Students' teachers allowed non-Hispanic students to use the restroom, Plaintiffs apparently assume the teachers denied them the right to use the restroom during class because of their race. However, Mr. Burnthorn avers he did not allow any student to leave class that day, and Mrs. Thomas, an African–American, avers Lourdes' allegations

are simply untrue because she did not discipline Lourdes. The school records support Mrs. Thomas' account because only Ms. Joiner submitted a disciplinary referral. However, even Ms. Joiner's disciplinary referral makes no reference to race. Instead, Ms. Joiner wrote up Lourdes' referral because of her inappropriate behavior. Defendant's evidence rebuts Plaintiffs' allegations that the teachers discriminated against them on the basis of race. In the absence of any evidence to the contrary, the Court finds Plaintiffs fail to raise a genuine issue of material fact for trial that the teachers intentionally discriminated against them on the basis of race. *See id; see also Matsushita Elec. Indus. Co.,* 475 U.S. at 586–87, 106 S.Ct. 1348 (finding that once a moving party carries its summary judgment burden, the burden shifts to the non-movant to come forward with specific facts showing that there is a genuine issue of fact for trial). Thus, the Court grants summary judgment in favor of Defendant with respect to Plaintiffs' claim of intentional racial discrimination. *See Coleman,* 113 F.3d at 533.

jected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ...." § 1983. When a plaintiff alleges constitutional violations under § 1983 against a municipality, a court must analyze whether 1) plaintiff's harm was caused by a constitutional violation; and 2) if so, whether the city is responsible for that violation. *See Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 121, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Thus, the Court first determines whether C–FISD, as a municipal entity, is responsible for the alleged harm suffered by the Plaintiffs and then determines if C–FISD violated Plaintiffs' constitutional rights. *See id.* at 120, 112 S.Ct. 1061.

### I. MUNICIPAL LIABILITY

■ Plaintiffs allege C–FISD is liable under § 1983 because it had a pattern or practice of violating their First Amendment rights. *See id.* at 120–21, 112 S.Ct. 1061. The parties agree that, in order to subject a school district to § 1983 liability, Plaintiffs are required to state a claim for municipal liability pursuant to the standard set forth in *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *See Collins*, 503 U.S. at 121, 112 S.Ct. 1061. In *Monell*, the United States Supreme Court made it clear that in order to impose liability upon a local governmental entity, a plaintiff must identify a municipal policy, custom, or practice that caused the viola-

tion of a plaintiff's constitutional rights.[16] *Id.* (citing *Monell*, 436 U.S. at 691, 98 S.Ct. 2018). By requiring a plaintiff to identify a policy, a municipality is held liable only for deprivations resulting from decisions of officials whose acts may fairly be said to be those of the municipality.[17] *Bd. of County Comm'rs of Bryan County*, 520 U.S. at 403–04, 117 S.Ct. 1382 (citing *Monell*, 436 U.S. at 691, 694, 98 S.Ct. 2018). Moreover, a plaintiff must demonstrate the municipality's *deliberate* conduct was the moving force behind the injury alleged. *Id.* at 404, 117 S.Ct. 1382 (emphasis in original). Thus, a plaintiff may not hold the municipality liable under § 1983 merely by identifying conduct that deprived a plaintiff of his or her constitutional rights, but must show the municipal action was taken with the requisite degree of culpability that caused the deprivation of federal rights. *Id.*

If a municipality does not have a written policy that violates a plaintiff's constitutional rights, it can still be held liable if the act was performed pursuant to a practice so widespread it has become a custom having the force of law. *Id.* ("an act performed pursuant to a custom ... may fairly subject a municipality to liability on the theory that the relevant practice is so widespread at to have the force of law"); *see also Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir.2001); *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018 (a local government may be sued for constitutional deprivations pursuant to a custom even if

---

**16.** Conversely, a municipality may not be held liable under § 1983 because it employs a tortfeasor under a *respondeat superior* theory. *See Collins*, 503 U.S. at 121, 112 S.Ct. 1061; *see also Bd. of County Comm'rs of Bryan County, OK v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *Pineda v. City of Houston*, 124 F.Supp.2d 1057, 1065 (S.D.Tex.2000). Thus, C–FISD is not liable under a *respondeat superior* theory if Principal

Garcia violated Plaintiffs' constitutional rights. *See Collins*, 503 U.S. at 121, 112 S.Ct. 1061.

**17.** Under Texas law, the final policy-making authority in an independent school district rests with the district's board of trustees. *Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1245 (5th Cir.1993).

such custom has not received formal approval through the body's official decision-making channels).

However, isolated violations are not the persistent, often-repeated, constant violations that constitute custom and policy that are required for municipal § 1983 liability. *Piotrowski*, 237 F.3d at 581 (citing *Bennett v. City of Slidell*, 728 F.2d 762, 768 n. 3 (5th Cir.1984), *cert. denied.* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985)). Because such isolated incidents are insufficient to establish a custom with the force of law, a plaintiff must show "at least a pattern of similar incidents in which citizens were injured" in order to demonstrate a governmental custom under § 1983. *See Estate of Davis ex rel. McCully v. City of N. Richland Hills,* 406 F.3d 375, 383 (5th Cir.2005) (finding a police officer was entitled to qualified immunity because one incident of his alleged excessive force did not demonstrate a pattern of violating constitutional rights).

Because Plaintiffs allege C–FISD has a pattern and practice of violating federal rights, they may hold C–FISD liable only if it had a traditional way of carrying out policy that has acquired the force of law and intentionally and deliberately caused the deprivation of their federal rights. *See Bd. of County Comm'rs of Bryan County,* 520 U.S. at 404, 117 S.Ct. 1382; *Piotrowski,* 237 F.3d at 579. Thus, the Court must determine whether Plaintiffs have demonstrated that C–FISD had a custom of denying parents and students the right to free speech, retaliating against them for expressing political views, and denying them a right to assemble peaceably on the school's property as evidenced by the events of March 2006.

C–FISD does not dispute that in March 2006 it prohibited students from wearing t-shirts expressing their opinions, asked teachers to keep students out of the hallways, and asked the Parents to leave the school property. However, Defendant posits its decisions during the particular situation at hand were not made with the purpose of violating students and parents' First Amendment rights but were made within their authority and duty to prevent disruption of the educational process. C–FISD argues the students were prohibited from wearing the t-shirts at issue and using the restroom during class in order to prevent riots, not to chill speech or to retaliate for expressing student viewpoints. C–FISD also explains that it asked the Parents to leave the school because it was trying to process suspensions for almost 130 students, could not meet with so many parents at once, and is statutorily required to protect each student's privacy.

Principal Garcia articulated numerous legitimate reasons for precluding students from wearing the t-shirts at issue and roaming the halls during class on Tuesday. In contrast to Plaintiffs' allegation that C–FISD has a custom of violating constitutional rights, Principal Garcia, who is also Hispanic, demonstrated his support for Plaintiffs' concerns by allowing them to express their views in the auditorium and by encouraging students to participate in a committee to explore the immigration issue.[18] The evidence establishes C–FISD did not intentionally discriminate against Students for their opinions but supported their views. *See Bd. of County Comm'rs of Bryan County,* 520 U.S. at 404, 117 S.Ct. 1382. Moreover, Plaintiffs provide no evidence of other instances when C–FISD allegedly violated these rights to

18. As noted previously, Principal Garcia showed his support for the Hispanic community by allowing students to express their opinions in Spanish if they preferred rather than in English.

establish a pattern or practice of violating constitutional rights. *See Bennett,* 728 F.2d at 768 n. 3. Finally, based upon the walk outs that occurred on Monday and the rumors circulating at the school, the Court is persuaded that Defendant's decisions were motivated by the need to maintain order and not to deprive students or parents of their constitutional rights. *See Bd. of County Comm'rs of Bryan County,* 520 U.S. at 404, 117 S.Ct. 1382.

Based upon these facts, the Court finds Plaintiffs' allegations against C–FISD, especially because they concede racial tensions existed and the t-shirts would have caused fights, are without merit. Plaintiffs have not shown the requisite causal connection for municipal liability by raising a genuine issue of fact that C–FISD prohibited the t-shirts at issue, prohibited students from using the restroom during class, and precluded parents from congregating on school property to deprive Plaintiffs of their federally protected rights. *See id.* at 404–05, 117 S.Ct. 1382. Accordingly, Plaintiffs failed to establish that C–FISD had a custom or policy of deliberately violating First Amendment rights for which it is liable under § 1983. *See Collins,* 503 U.S. at 120, 112 S.Ct. 1061.

## II. First Amendment Violation

Although the Court finds Plaintiffs failed to establish municipal liability under § 1983, the Court must also determine if Plaintiffs establish the second element of municipal liability by establishing C–FISD violated Plaintiffs' constitutional rights. *See id.*

The First Amendment, applicable to the States through the Fourteenth Amendment, states that "Congress shall make no law ... abridging the freedom of speech, ... or the right of the people peaceably to assemble ...." U.S. Const. amend. I. Plaintiffs allege C–FISD violated their First Amendment constitutional rights because it 1) prohibited students from wearing We Are Not Criminals t-shirts as expressive speech, 2) retaliated against students by denying them access to the restroom because they expressed their political views, and 3) denied parents the right to peaceable assembly by asking them to leave the school premises. Thus, the Court must determine whether these decisions violated Plaintiffs' First Amendment rights. *See id.*

### A. Free Speech

Plaintiffs allege that denying students the right to wear a We Are Not Criminals t-shirt is a violation of their First Amendment right to free speech. In response, Defendant first argues Plaintiffs do not have standing to assert any claims based upon the t-shirt issue.

To establish standing in federal court, a plaintiff must demonstrate three elements: 1) he or she suffered an injury in fact—an invasion of a legally protected interest which is a) concrete and particularized, and b) actual or imminent, not conjectural or hypothetical; 2) a causal connection between the injury and the conduct complained of—the injury is fairly traceable to the challenged action of the defendant; and 3) it must be likely that the injury will be redressed by a favorable decision.[19] *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

---

**19.** C–FISD alleges Plaintiffs cannot meet the first element. However, it does not dispute Plaintiffs meet the second and third elements of standing because C–FISD denied Plaintiffs the right to express their political views by wearing the t-shirt at issue. *See id.* Moreover, if C–FISD's decision violated Plaintiffs' constitutional rights, the Court may redress their injury. *See id.*

The parties agree C–FISD precluded all students, including Lourdes and Jennifer, from wearing the t-shirts at issue to express their viewpoints. Defendant posits Plaintiffs lack standing because Lourdes was not asked to change her We Are Not Criminals t-shirt. However, even if Lourdes was not asked to change her shirt the day she wore it, she had a constitutional right to express her opinion every day that must be balanced with a school's authority to regulate school affairs. *See Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437, 441 (5th Cir.2001) (citing *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986)). There is a reasonable inference that absent Principal Garcia's decision, the Students would have worn the t-shirt at issue other days that week. Thus, the Court finds Plaintiffs suffered an injury in fact because C–FISD prohibited the Students from wearing the t-shirt that expressed their opinion regarding immigration legislation and potentially invaded their constitutional right to free speech. *See Tinker v. Des Moines Indep. Cmty. Dist.*, 393 U.S. 503, 513–14, 89 S.Ct. 733, 21 L.Ed.2d 731 (1968) (holding that in the absence of any facts reasonably forecasting substantial disruption with school activities, students had a constitutional right to wear black armbands to express disapproval of the Vietnam war). Thus, the Court finds

Plaintiffs established standing to bring their claim to federal court. *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130.

In response to the merits of Plaintiffs' allegation, Defendant asserts it did not violate their constitutional right by prohibiting the t-shirts because it had a reasonable belief that wearing them would like y lead to a material and substantial disruption. Because Plaintiffs' claim stems from speech prohibited by Cy–Fair, the parties agree Cy–Fair's regulations directed at specific student viewpoints are analyzed under the standard articulated in *Tinker*.[20] *See Canady*, 240 F.3d at 442 (citing *Tinker*, 393 U.S. at 508, 89 S.Ct. 733).

Even though certain forms of expressive conduct and speech are sheltered under the First Amendment, constitutional protection is not absolute, especially in the public school setting. *Canady*, 240 F.3d at 441. A student's First Amendment rights in a public school are not coextensive with the rights of an adult in other settings and must be applied in light of the special characteristics of the school environment. *Morse v. Frederick*, — U.S. ——, 127 S.Ct. 2618, 2622, 168 L.Ed.2d 290 (2007). Educators have an essential role in regulating school affairs and establishing appropriate standards of conduct.[21] *See Canady*, 240 F.3d at 441 (citing *Bethel Sch.*

---

**20.** The United States Supreme Court has established three categories of student speech regulations. *Canady*, 240 F.3d at 441–42. The first category involves school regulations directed at specific student viewpoints, analyzed under *Tinker*. *Id.* at 442. The second category of regulated student speech involves lewd, vulgar, obscene, or plainly offensive speech. *See id.* The third category of regulated student speech is student expression related to school-sponsored activities. *Id.* Additionally, the government can proscribe speech constituting a true threat of violence without offending the First Amendment. *See Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 616 (5th Cir.2004), *cert. denied*, 544 U.S. 1062,

125 S.Ct. 2530, 161 L.Ed.2d 1112 (2005). In this case, C–FISD regulated specific student viewpoints by proscribing students from wearing We Are Not Criminals and Border Patrol t-shirts which the parties understood to be a specific viewpoint regarding immigration issues. Thus, C–FISD's regulation is analyzed under *Tinker*.

**21.** Moreover, a school board, not federal courts, has the authority to decide what constitutes appropriate behavior and dress in public schools. *See Canady*, 240 F.3d at 441; *Bethel*, 478 U.S. at 685, 106 S.Ct. 3159.

*Dist. No. 403,* 478 U.S. at 681, 106 S.Ct. 3159).

 However, in recognition of students' constitutional rights, *Tinker* explains that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker,* 393 U.S. at 507, 89 S.Ct. 733; *Morse,* 127 S.Ct. at 2625. Thus, a school official's discretion in managing school affairs must be balanced against a student's constitutional rights to free speech. *See Morse,* 127 S.Ct. at 2622 (holding that schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use); *Porter,* 393 F.3d at 614 (recognizing the difficulty school administrators face to find a balance between their duty to provide a safe school and the constitutional rights of individual students when school violence is a serious concern); *Bethel Sch. Dist. No. 403,* 478 U.S. at 681, 106 S.Ct. 3159 (explaining that free speech protects divergent political views in school but must be balanced against society's countervailing interest in teaching students consideration for the personal sensibilities of the other participants). Thus, where school administrators reasonably believe the students' uncontrolled exercise of expression would materially and substantially interfere with the work of the school or impinge upon the rights of other students, they may forbid such expression. *Tinker,* 393 U.S. at 509, 89 S.Ct. 733; *Morse,* 127 S.Ct. at 2626. With these principals in mind, the Court must determine whether C–FISD demonstrated that it lawfully precluded students from wearing the t-shirts at issue because the message would materially and substantially interfere with the work of the school or impinge upon the rights of other students. *See Tinker,* 393 U.S. at 509, 89 S.Ct. 733.

It is undisputed that about 300 Cy–Fair students participated in Monday's Walk out and 130 students participated in Tuesday's Walk out to protest the pending immigration legislation. Thus, in March 2006, the Court finds the students' response to the immigration issue by walking out of school substantially interfered with the work of Cy–Fair. *See id.*

Even if the walk outs had not occurred, Cy–Fair had the authority to prohibit the students from wearing the t-shirts at issue in this instance because administrators have the authority to prevent problems before they occur and are not limited to prohibiting conduct only after it has caused a disturbance. *See D.B. ex rel. Brogdon v. Lafon,* 217 Fed.Appx. 518, 523 (6th Cir.2007) (explaining that because a school had a recent history of racial tensions, "school officials reasonably could surmise that displaying a Confederate flag posed a substantial risk of provoking problems in the incendiary atmosphere then existing"); *Scott v. Sch. Bd. of Alachua County,* 324 F.3d 1246, 1248 (11th Cir. 2003) (affirming a district court's determination that a school's ban on Confederate symbols was appropriate based upon the potential disruption that displaying the Confederate symbols would likely create); *West v. Derby Unified Sch. Dist.,* 206 F.3d 1358, 1367 (10th Cir.2000) (same). Moreover, in this case, the t-shirts were not prohibited based only upon a potential for disruption but to forestall further disruption caused by hundreds of students walking out of school. *See Tinker,* 393 U.S. at 509, 89 S.Ct. 733.

The evidence shows school officials held a reasonable belief that wearing the t-shirts at issue would cause further, perhaps more severe disruption and put student safety at risk. *See id.* Students and Parents testified they believed there were racial tensions among the Hispanic, Afri-

can–American, and Caucasian groups at Cy–Fair. Students also testified that non-Hispanic students were making jokes about the immigration issue, and they felt hostility from non-Hispanic students. The Students heard rumors about the Border Patrol t-shirts and testified that if other students wore those t-shirts, there would have been a fight. Thus, the Students' testimony corroborates Principal Garcia's concern that racial tensions were rising, and that if competing student groups wore the t-shirts at issue, there could be a riot. *See id.*

Moreover, faced with hundreds of students who were disrupting the educational process and two-thirds of the student body who might have antagonized the Hispanic students by wearing a Border Patrol t-shirt, the Court finds Principal Garcia made the proper decision to ban the t-shirts in order to *protect* the Hispanic students from the animosity of the other students, not to harm them by precluding their speech. Based upon these facts, the Court finds Principal Garcia reasonably believed it necessary to prohibit students from wearing both t-shirts at issue because the expressions on them would exacerbate hostility within the student body and could cause fights that would materially and substantially interfere with the work of the school. *See Tinker*, 393 U.S. at 509, 89 S.Ct. 733; *see also D.B. ex rel. Brogdon*, 217 Fed.Appx. at 523. Accordingly, Defendant did not interfere with Plaintiffs' First Amendment right to free speech by prohibiting students from wearing the t-shirts at issue. *See Tinker*, 393 U.S. at 509, 89 S.Ct. 733; *see also Collins*, 503 U.S. at 120, 112 S.Ct. 1061.

## B. Retaliation

■ The Students also contend they were harmed because C–FISD retaliated against them for expressing their political viewpoints. The basis of this allegation stems from the Students' contention that teachers denied them access to the restroom during class in retaliation for wearing a We Are Not Criminals t-shirt.[22] In opposition, Defendant argues Plaintiffs do not satisfy the elements of a First Amendment retaliation claim. Thus, the Court must determine whether Plaintiffs established a material issue of fact that C–FISD retaliated against them for expressing their political viewpoints. *See Collins*, 503 U.S. at 120, 112 S.Ct. 1061.

In order to show a claim of First Amendment retaliation, plaintiffs must show 1) the Students were engaged in a constitutionally protected activity; 2) C–FISD's actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and 3) the protected activity was a substantial or motivating factor in C–FISD's conduct. *See Corales v. Bennett*, 488 F.Supp.2d 975, 985 (C.D.Cal.2007) (citing *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006)). If Plaintiffs established these elements, C–FISD can escape liability by showing it would have taken the same action even in the absence of the protected conduct. *Id.*

A choice to wear clothing as a symbol of an opinion or cause is undoubtedly protected under the First Amendment if the message is likely to be understood by those intended to view it. *See Canady*, 240 F.3d

---

**22.** Because Jennifer concedes she did not wear a We Are Not Criminals t-shirt, Jennifer has no claim of retaliation because she did not communicate her views to her teachers. *See Cabrol v. Town of Youngsville*, 106 F.3d 101, 108–09 (5th Cir.1997) (finding a plaintiff did not engage in expressive conduct for purposes of his First Amendment retaliation claim when his actions were not communicated to any viewers). Thus, the Court finds Plaintiffs' retaliation claim stems from C–FISD's conduct with respect to Lourdes.

at 440–41. Neither party disputes that students were wearing the We Are Not Criminals t-shirt to express their political viewpoint. Moreover, the parties agree the students, faculty, and administration at Cy–Fair understood the message of the t-shirt. Thus, relative to the first element, the Court finds Lourdes was engaged in a constitutionally protected activity when she wore a We Are Not Criminals t-shirt. *See Corales,* 488 F.Supp.2d at 985.

However, the Court finds Plaintiffs fail to meet the second and third elements of a First Amendment retaliation claim. Relative to the second element, the parties dispute whether C–FISD's actions would chill a person of ordinary firmness from continuing to engage in the protected activity. *See id.* Plaintiffs posit that precluding a person from using the restroom will likely cause pain and discomfort. However, the Court notes that C–FISD did not preclude students from using the restroom for an extended period of time, but only during the time the students were in class. Thus, the Court finds that requiring students to remain in the classroom and use the restroom between scheduled classes does not constitute an action by C–FISD that would chill a person of ordinary firmness from wearing a t-shirt to express his or her political viewpoint. *See id.* Thus, Plaintiffs fail to meet the second element of a First Amendment retaliation claim. *See id.*

Relative to the third element, Plaintiffs must show that wearing the t-shirt as a political expression was a substantial or motivating factor in the Defendant's denying them the right to use the restroom during class. *See id.* Although Lourdes contends Mrs. Thomas denied her the right to use the restroom because she was wearing the t-shirt at issue, the evidence shows Mrs. Thomas did not discipline Lourdes. Ms. Joiner apparently denied Lourdes' request because she had not finished her work. Thus, there is no evidence to suggest Lourdes was denied the right to use the restroom during class based upon her political views. In contrast, the evidence shows Lourdes was denied the right to leave Ms. Joiner's class because of her own inappropriate behavior. Thus, Plaintiffs fail to establish Lourdes' protected activity motivated any teachers' decision to deny her restroom privileges during class. *See id.* Accordingly, Plaintiffs fail to establish Defendant retaliated against them for expressing their First Amendment right to free speech. *See id;* *see also Collins,* 503 U.S. at 120, 112 S.Ct. 1061.

## C. Right to Assemble Peaceably

■ Plaintiffs also assert C–FISD violated their First Amendment right to assemble peaceably by prohibiting them from being on school property. School officials have the authority to control students and school personnel on school property and to insist that parents and third parties conduct themselves appropriately while on school property. *Lovern v. Edwards,* 190 F.3d 648, 655–56 (4th Cir.1999) (citing *Carey v. Brown,* 447 U.S. 455, 470–71, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980)). School administrators are not required to provide parents with unfettered access to school property. *See id.* (affirming a district court's determination that the school did not violate a parent's First Amendment right of assembly by prohibiting him from entering the school property when he was disruptive). A school administration's authority to control activities on school property includes preventing parents access to the premises when necessary to maintain order and prevent disruptions to the educational environment. *Rodgers v. Duncanville I.S.D.,* No. 3–04–CV–1365–D, 2005 WL 770712, at *2 (N.D.Tex. Apr.5, 2005) (granting summary judgment in fa-

vor of the school district because it had not violated a parent's constitutional rights by denying him access to his children's school); *see also Van Deelen v. Shawnee Mission Unified Sch. Dist. # 512*, 316 F.Supp.2d 1052, 1057 (D.Kan.2004) (same); *Ryans v. Gresham*, 6 F.Supp.2d 595, 601 (E.D.Tex.1998) (finding a parent had no constitutional right to access his or her child's academic environment).

Although the Parents claim Defendant violated their right to assemble at the school, the Court disagrees. Although students were suspended for walking out of school on Tuesday, March 28, 2006, they were not disciplined for walking out on Monday, were given an opportunity to appropriately express their opinion, and were warned not to walk out on Tuesday. Because 130 students disobeyed this directive, they were appropriately suspended. Yet, when the Parents arrived at school on Wednesday to pick up their students, they failed to cooperate with the disciplinary process C–FISD established. Instead, they demanded an immediate interview with the administration and asked other parents about other students' discipline.[23] Moreover, although the Parents were asked to move outside, they remained in the building and made it difficult for other parents to pick up their students. Thus, the Court finds C–FISD had the authority to deny Parents access to school property because it was necessary to maintain the education process and the suspension process for the remaining students and parents. *See Lovern*, 190 F.3d at 655. Therefore, the Court finds Defendant did not violate the Parents' First Amendment right to assemble. *See Collins*, 503 U.S. at 120, 112 S.Ct. 1061.

In sum, the Court finds C–FISD's decisions to preclude students from wearing the t-shirts at issue, to preclude students from leaving the classroom to use the restroom during class time, and to ask the parents to leave the school premises were properly made by Principal Garcia in his role of regulating school affairs and establishing appropriate standards of conduct. *See Tinker*, 393 U.S. at 509, 89 S.Ct. 733; *Corales*, 488 F.Supp.2d at 985; *Lovern*, 190 F.3d at 655–56. Because Plaintiffs fail to establish C–FISD violated their First Amendment right of free speech, retaliated against them, or violated their right of assembly and fail to establish C–FISD engaged in a custom of violating Plaintiffs' rights, the Court finds Plaintiffs' fail to establish the elements of municipal liability under § 1983. *See Collins*, 503 U.S. at 120, 112 S.Ct. 1061. Accordingly, the Court hereby

ORDERS that Defendant David G. Anthony's Motion for Summary Judgment (Document No. 23) is GRANTED.

---

**23.** The Court notes that although the Parents were dissatisfied with being asked to schedule an appointment, Principal Garcia sought to comply with his legal duty to protect all students and parents' privacy rights.